[Crim. No. 881. Second Appellate District, Division Two.—September 6, 1922.]

## THE PEOPLE, Respondent, v. EDWARD BANNON, Appellant.

[1] CRIMINAL LAW—MURDER—EVIDENCE—PASS-BOOK CONTAINING BUL-
LET HOLE.—Where in the joint prosecution of a husband and wife
for murder the wife of the deceased testified that she and her hus-
band were flanked by the defendants, the defendant wife firing
from one side and the defendant husband from the other, it was
not error to admit in evidence a pass-book taken from the body
of the deceased which had been perforated by one of the bullets,
since it was important as tending to show the course and direction
of the bullet that had pierced it.

[2] ID.—PHOTOGRAPH OF DECEASED. — In such prosecution, the defend-
ants were not prejudiced by the conduct of the district attorney
in offering a photograph of the deceased for the purpose of show-
ing the appearance of the deceased in his lifetime and to allow the
jury to see his character from his picture, where the objection to
the offer was sustained, and the photograph subsequently properly
admitted for the purpose of showing that the deceased was not the
man who had purchased the pistol found near his body after the
murder.

[3] ID.—JOINT PROSECUTION OF HUSBAND AND WIFE—ALLEGED INTIMACY
OF DECEASED — EVIDENCE — CONTEMPLATED SEPARATION.—Where in
such prosecution it was the claim of the defendant husband that
the deceased had debauched his wife, evidence that two days prior
to the homicide the defendants had called on a justice of the peace
for the purpose of having an agreement of separation prepared and
that the defendant stated that he would no longer live with his
wife was relevant and material as tending to show jealousy and
motive.

[4] ID.—CONDUCT OF DEFENDANTS BEFORE SHOOTING.—Evidence in such
prosecution that a few .minutes before the shooting a man and
woman were seen scuffling in the street and that the man grabbed
something from the woman and ran, the woman following and scream-
ing, was competent, in conjunction with other evidence, to justify
the inference that the man and woman were the defendants and
that the defendant husband repelling his wife's objections ran to
the place of the shooting to kill the deceased.

[5] ID. — PRESENCE OF DECEASED AT DEFENDANT'S HOUSE — FORM OF
QUESTION.—In such prosecution, a question put to a witness as to

2. Use of photographs as evidence, notes, 75 Am. St. Rep. 468; 114
Am. St. Rep. 437; 35 L. R. A. 802; 51 L. R. A. (N. S.) 842.

whether he had ever told the defendant husband that he had ever seen the deceased coming from defendant's house was not erroneous as leading, since the form of the question was within the discretion of the trial court.

[6] ID.—INCRIMINATORY DECLARATIONS—VOLUNTARY CHARACTER—STATEMENT OF WITNESS.—In such prosecution, it was not error to ask a witness as to whether any threats, promises, or inducements were made to the defendants at the time when they made certain incriminatory statements shortly after the homicide.

[7] ID.—OWNERSHIP OF REVOLVER—TESTIMONY OF HANDWRITING EXPERT.—Where in such prosecution it was the theory of the prosecution that the defendants placed the pistol found near the body of the deceased, evidence of a handwriting expert that he had compared the signature of the deceased with the signature of the fictitious person signed to the record of the sale of the revolver and that in his opinion the two signatures were not made by the same person was admissible.

[8] ID.—DEFENDANT AS WITNESS—IMPEACHMENT—BAD REPUTATION.—When the defendant in a criminal case testifies for himself and gives testimony to exonerate him from the crime for which he is on trial, he, for the time being, removes from himself the character of a defendant and becomes subject to the same rules for testing his credibility before the jury, by impeachment or otherwise, as any other witness, and may be impeached by testimony that his general reputation in the community for truth, honesty, and integrity is bad.

[9] ID.—FORM OF INSTRUCTIONS.—A defendant is not entitled to an instruction in any set form of words, and the requirements of the statute are met by any form which fully and fairly presents the point at issue.

[10] ID.—INSTRUCTIONS COVERED BY OTHERS.—Proffered instructions intended simply to emphasize propositions which are covered by other instructions are properly refused.

[11] ID.—CIRCUMSTANCES OF MITIGATION OF CRIME—BURDEN OF PROOF—INSTRUCTION.—The refusal in such prosecution to charge the jury that if they should find that the crime amounts only to manslaughter, or was justifiable or excusable, no burden is placed on the defendant to prove any of the circumstances that excuse him, was not erroneous, where the jury was charged in the language of section 1105 of the Penal Code that upon a trial for murder, the commission of the homicide by the defendant being proved, the burden

7. Value of expert testimony as to handwriting, notes, L. R. A. 1918D, 642; 42 L. R. A. 771.

8. Impeaching the character of the accused for credibility, notes, 20 L. R. A. 616; 41 L. R. A. (N. S.) 901.

of proving circumstances of mitigation, or that justify or excuse it, devolves upon him, unless the proof on the part of the prosecution tends to show that the crime committed only amounts to manslaughter, or that the defendant was justifiable or excusable.

APPEAL from a judgment of the Superior Court of Los Angeles County and from an order denying a new trial. John W. Shenk, Judge. Affirmed.

The facts are stated in the opinion of the court.

O. N. Hilton, Dan Critchley, Caesar A. Roberts and L. M. Roberts for Appellant.

U. S. Webb, Attorney-General, and John W. Maltman, Deputy Attorney-General, for Respondent.

FINLAYSON, P. J.—The appellant, Edward Bannon, and his wife, Elizabeth Bannon, were charged with the murder of James H. Brigham, alleged to have been committed on September 10, 1921, at Sawtelle, in Los Angeles County. The two defendants were tried jointly. Elizabeth Bannon was acquitted, but her husband was convicted of murder in the second degree. He appeals from the judgment of conviction and likewise from the order denying his motion for a new trial.

That Edward Bannon shot and killed Brigham is an undisputed fact; but it is claimed that he shot in self-defense. The record here is very voluminous. We shall not attempt to give more than a bare outline of the case, sufficient, however, to make understandable the points to be discussed. It seems that appellant, a young man about twenty-seven years of age, was employed as a motorman on the Pacific Electric Railway. The deceased, who was about forty years old and employed as a terminal foreman for the same company, was Bannon's superior. Bannon claims that shortly prior to the tragedy his wife confessed to him that she had been debauched by Brigham, who, it was claimed, had forced his way into the Bannon home during the husband's absence. On the day preceding the homicide Bannon and his wife called on Brigham at the freight office of the company, and there Bannon taxed Brigham with having forced Mrs. Bannon to submit to his unlawful embraces. Brigham ordered

the Bannons out of his office. Bannon then told the superintendent and assistant superintendent that Brigham had compelled Mrs. Bannon to have intercourse with him at the latter's home. The superintendent, with a view to investigating the charge, sent word to Brigham to call at his office on the following Saturday, September 10th. Brigham did not call. He was killed on the evening of that day. The homicide took place at 10 o'clock at night, in Sawtelle, at or near the intersection of Santa Monica Boulevard with Tenth Street, which was about two blocks from the home of the Bannons, who lived on Ohio Street, near Ninth.

According to the testimony of J. M. Parker, a witness for the people, Brigham, about noon of September 10th, had made an appointment to call that evening on Mr. and Mrs. Parker and bring Mrs. Brigham with him. Parker lived about seven blocks from the scene of the tragedy. Mrs. Brigham, who lived with her husband in Santa Monica, on Santa Monica Boulevard, testified that she and her husband started to call on the Parkers on the evening of September 10th; that they got off the car at First Street, intending to make the call, but that they were late, and for that reason, as well as because it was a beautiful moonlight evening, they concluded not to call on the Parkers, and, instead, walked back to where Santa Monica Boulevard intersects Ninth Street, and there sat on a bench to rest; and that while she and her husband were sitting on the bench, Mr. and Mrs. Bannon drove by in their automobile. It seems that after passing the spot where the Brighams were seated, Bannon and his wife drove to their garage in the rear of their home, a block distant from where Mr. and Mrs. Brigham had been sitting. After putting the automobile in the garage, the Bannons, it would seem, returned to the spot where, a few minutes previously, they had seen the Brighams sitting on the bench. Meanwhile Mr. and Mrs. Brigham had walked one block along Santa Monica Boulevard to where that thoroughfare is intersected by Tenth Street—the scene of the homicide. Presently the Bannons appeared. What then took place is described variously by the witnesses. Mr. and Mrs. Bannon testified that when they arrived at the intersection of Santa Monica Boulevard with Tenth Street Brigham stepped out, said "Bannon," and immediately commenced shooting, and that then Bannon, in self-

defense, drew his Colt's automatic revolver and returned the fire, killing Brigham.

Mrs. Brigham, testifying as a witness for the people, described the circumstances of the killing of her husband substantially as follows: My husband and I got up from the bench on the corner of Ninth and Santa Monica Boulevard and walked down the boulevard as far as Tenth Street, when the Bannons came up from behind—Bannon calling to Mr. Brigham. As Mr. Brigham turned around in response to the call, Bannon "grabbed a firearm or something from Mrs. Bannon's coat and commenced firing at Mr. Brigham." Before Bannon commenced shooting I heard him say to someone, "Give me them," or "Give me those." Mr. Bannon was on one side of me and Mrs. Bannon was on the other. Shots were fired on each side of me. Many shots were fired. I know Bannon fired. Mr. Brigham was unarmed. He was shot in four places, and fell to the ground—"crumpled right down in a heap."

Three revolvers figure in the case, one a Colt's automatic. Bannon admitted using this pistol and that he fired a number of shots from it. Shortly after the slaying a 32-caliber, long-barreled, short-cartridge revolver, made by the American Revolver Company, was picked up. It was found on the ground, on the left side of Brigham's body, a foot or eighteen inches distant from where the body lay. Later another revolver, a 32-caliber Iver Johnson pistol, was found. It seems that shortly after her arrest, which followed on the heels of the tragedy, Mrs. Bannon, according to witnesses for the prosecution, said to an officer at the police station, "I am sure Mr. Brigham had a gun, and you will find a gun over the fence, or around the fence where he fell." The officer then went to the place described by Mrs. Bannon and there found the Iver Johnson revolver, lying against the fence near the scene of the killing. It was a five-cylinder pistol, from which three shots had recently been fired, as shown by the empty shells and the smell of recently burned gunpowder. When the officer returnd to the police station Mrs. Bannon, according to the testimony of the people's witnesses, exclaimed, in the presence of her husband, "You are safe now, Ed; they found the revolver." Bannon testified that the pistol which was found a foot or eighteen inches from Brigham's body—the pistol

made by the American Revolver Company—was a weapon which Mrs. Brigham had in her left hand at the time of the shooting, and claims that Mrs. Brigham dropped it as she leaned over to pick up her husband's head after the firing had ceased. Appellant also claims that the Iver Johnson pistol—the weapon which was found lying against the fence —was used by the deceased, and that from it Brigham had fired three shots at appellant. Mrs. Brigham, on the other hand, testified positively that her husband was not armed that night, and that he did not fire a shot. It seems to have been the theory of the prosecution that the Iver Johnson pistol and likewise the long-barreled revolver which lay near where Brigham's body fell were "planted" by either Mr. or Mrs. Bannon in order to lay the foundation for the claim that the killing was done in self-defense.

As is usual in such cases, there is a sharp conflict in the evidence. And though we have not deemed it necessary to narrate the defendants' description of the circumstances attending this fatal occurrence, appellant's own story undoubtedly exculpates him. It was for the jury, however, to say whether his story should be believed. The testimony of Mrs. Brigham, together with that of other witnesses for the prosecution, was sufficient, if true, to justify the verdict. The facts testified to by the witnesses and their significance were for the jury to weigh and determine; and their verdict, having substantial evidence to support it, cannot be disturbed, unless it is vitiated by some erroneous ruling of the court.

It is not contended that the facts related by Mrs. Brigham, if true, would not warrant appellant's conviction, but that her testimony is not to be believed. The truth or falsity of her testimony, however, was exclusively for the determination of the jury and the trial court. The office of a reviewing court in a case such as this is very clearly stated in *People* v. *Emerson,* 130 Cal. 562, 563 [62 Pac. 1069]: "The principal ground of the appeal is that the verdict is contrary to law and the evidence, and upon this point counsel contend that all the evidence—that introduced by the prosecution no less than the evidence of the defendant himself—shows clearly and without conflict that the killing (which is admitted) was done in necessary self-defense, or at least under circumstances which negative the existence of

any deliberate purpose on the part of the defendant to take the life of the person slain. Necessarily, this contention as to the absence of any conflict in the evidence must be made good in order to sustain the appeal upon the ground stated; *for if the evidence which bears against the defendant, considered by itself, and without regard to conflicting evidence, is sufficient to support the verdict,* the question ceases to be one of *law*—of which alone this court has jurisdiction—and becomes one of *fact* upon which the decision of the jury and the trial court is final and *conclusive.*" (Italics ours.) There was sufficient evidence to justify the verdict, and it, therefore, may not be disturbed by us unless the rulings of the trial court, presently to be considered, disclose prejudicial error.

[1] Appellant complains of the admission in evidence of a pass-book taken from the body of the deceased and which had been perforated by one of the bullets entering the body. Because the killing was not denied, it is claimed that this evidence was not material and could only serve to prejudice the jury against the defendants. The people rested under the necessity of establishing a tragedy involving the violent death of a human being from mortal wounds, unlawfully inflicted with malice aforethought. Any of the details of such a horrifying affair must necessarily have a tendency to cause a 'normal person to recoil with repugnance. But, as was said by the supreme court of Kansas in *State* v. *Moore,* 80 Kan. 232 [102 Pac. 475] : "A court cannot arrange for lively music to keep the jury cheerful while the state's case in a murder trial is being presented, and grewsome evidence cannot be suppressed merely bcause it may strongly tend to agitate the jury's feelings." As a general rule, physical objects which constitute a part of the transaction, or which serve to unfold or explain it, may be exhibited in evidence, if properly identified, whenever the transaction is under judicial investigation. Thus, clothing worn by the deceased at the time of the homicide is admissible in evidence as a part of the *res gestae.* (*People* v. *O'Brien,* 78 Cal. 44 [20 Pac. 359].) According to the testimony of Mrs. Brigham, she and her husband were flanked by the Bannons—Mrs. Bannon firing from one side and her husband from the other. Mrs. Bannon, who was on trial for the murder, denied having fired a shot. The pass-book, therefore, was important as

tending to show the course and direction of the bullet that
had pierced it. It was not error to admit the book in evi-
dence.

[2] Appellant claims to have been prejudiced by the
conduct of the district attorney, who offered a photograph
of the deceased for the purpose of showing, as he stated,
''Brigham's appearance in his lifetime, . . . to allow the
jury to see his character from the picture.'' Defendants'
counsel objected to the introduction of the photograph for
any such purpose. The objection was very properly, and,
we may add, very promptly sustained. We fail to see how
this incident could possibly have prejudiced appellant's case.
Subsequently the photograph was admitted in evidence for a
legitimate and proper purpose—for the purpose of showing
that Brigham was not the man who had purchased the Iver
Johnson pistol.

[3] The justice of the peace at Sawtelle, William G.
Bryce, a witness for the people, was permitted to testify
that Mr. and Mrs. Bannon had called on him at his office
two days prior to the homicide; that Bannon, who was very
nervous, said that he and his wife had been having trouble
and that he wanted the witness to draw up an agreement of
separation or divorce; that there was considerable argu-
ment between them as to what grounds they had for divorce,
and as to the disposition of their property; that Mrs. Ban-
non commenced to cry, and said that if her husband left
her she would kill herself; that Bannon said he would not
live with her any longer, that she had once left him in a
hospital in the east and had gone away with another man,
that she could not have any children and that someone had
said he had seen another man coming out of his (Ban-
non's) house early one morning, and that Mrs. Bannon said,
''Judge, there is no such person; it is only his imagination.''
This testimony went in over defendants' strenuous objection.
Its admission was not error. It doubtless was received to
show the state of mind of the Bannons at the time of the
shooting. It tended to bear out the prosecution's contention
that Edward Bannon, the husband, was enraged by his
wife's supposed adultery with Brigham, and, further, that
his dominant personality overpowered her volition and thus
prevailed upon her, first to admit her intimacy with Brig-
ham, and then to participate in the homicide two days later.

The testimony not only tended to show Bannon's all-consuming jealousy and thus disclosed a motive on his part for taking the life of Brigham, whom he had charged with having debauched his wife, but, by disclosing Mrs. Bannon's extreme repugnance to being cast off by her husband, it likewise had some tendency to show that she might do her husband's bidding, even to the point of assisting him in the slaying of Brigham. For these reasons, the testimony was both relevant and material.

[4] Appellant next complains of the admission in evidence of the testimony of Sadie Smith, a witness for the prosecution, who testified that her home is a few doors from that of the Bannons; that on the night of September 10th, at about 10 o'clock, she heard an automobile pass by her house and stop; that a few minutes later she heard scuffling in the street about two houses from her home; that she went to her bedroom window, looked out, and saw a man and a woman scuffling in the street—in Ohio Street, right across the way; that she saw the man grab something and start to run; that the woman followed him, screaming; that they ran down Ohio Street; that she could not identify the man or the woman; and that a few minutes later she heard the shooting. On motion of defendants, the court struck out all of the testimony of this witness on the ground that there was no evidence which identified the man and woman whom she saw scuffling and running in the street. The ruling, however, was immediately reversed, the court being assured by the prosecutor that he later would supply the necessary identification. Subsequently, Officer Mahoney was called and testified that after the shooting he followed the tracks made by defendants' machine, and found that they had stopped nearly in front of Mrs. Smith's house. At the conclusion of the case defendants again moved to strike out the testimony of Sadie Smith. The motion was denied. It was for the jury to consider and weigh all of the circumstances testified to by Sadie Smith and Officer Mahoney. Those circumstances, in conjunction with other facts brought out by the testimony of other witnesses, were sufficient to justify the inference that the man and woman seen by Mrs. Smith were Mr. and Mrs. Bannon, and that Bannon, repelling his wife's vehement objections, with malignancy in his heart and bent on murdering the man whom he sup-

posed had been intimate with his wife, ran to the place where he had seen Mr. and Mrs. Brigham but a few moments previously, intending to shoot down the victim of his jealous rage.

[5] Bannon claimed that about three days prior to the tragedy a workman of the name of Border, a resident of Sawtelle who seems to have been somewhat of a scandal-monger, related to him certain information from which he, Bannon, suspected that Brigham might have been at his home with Mrs. Bannon during the husband's absence. The prosecution put Border on the witness-stand and propounded to him this question: "Now, did you ever tell Bannon at any time that you saw Brigham coming from Bannon's house? A. No sir." Defendant's counsel objected to the question on the ground that it was leading. There was no error here. The matter of the form of the question was within the discretion of the trial court. (*People* v. *Fong Ah Sing,* 70 Cal. 12 [11 Pac. 323]; *People* v. *Goldenson,* 76 Cal. 349 [19 Pac. 161]; *People* v. *Nunley,* 142 Cal. 445 [76 Pac. 45].)

[6] There was no error in the admission of the declarations made by the defendants at the police station while under arrest and shortly after the homicide. The evidence shows that the statements were freely and voluntarily given. There may be some question as to whether they were so far inculpatory as to amount to confessions of guilt. But, be this as it may, the prosecutor, who assumed that the declarations might possibly be construed as confessions, and that, therefore, it would be necessary to lay a foundation for their admission by proving their voluntary character, asked one of the witnesses if any threats were made against either Mr. or Mrs. Bannon at the time when they made the statements, or if any force or violence was used against either, or if any promises of reward or hopes of immunity were held out to them. To this form of question counsel for defendants objected, upon the ground that it called for the conclusion of the witness. The court overruled the objection and told counsel for the defendants that they would be accorded the privilege of cross-examining the witness with respect to the voluntary character of the statements. There was no error in the ruling. (*People* v. *Rodundo,* 44 Cal. 538, 540; *People* v. *Goldenson,* 76 Cal. 350 [19 Pac. 161]; *Crain* v. *State,* 166

Ala. 1 [52 South. 31].) In *Crain* v. *State* the court said: "In the laying of a predicate for the introduction of evidence of confessions made by the defendant, the question, 'Were there any promises, threats, or inducements made to the defendant before the statements were made by him?' is not open to the objection that it called for a conclusion of the witness, and was properly allowed by the court."

[7] Mrs. Brigham, it will be recalled, testified that her husband had no weapon upon his person on the evening of the slaying. Whether, therefore, the Iver Johnson revolver —the pistol which was found leaning against the fence— was the property of the deceased or of one of the defendants was a material fact in the case. As we have had occasion to say, it evidently was the theory of the prosecution that the defendants, or one of them, for the purpose of fabricating a counterfeit setting for a plea of self-defense, "planted" the Iver Johnson pistol and likewise the 32-caliber long-barreled revolver which was picked up near the spot where Brigham fell. The man who sold the Iver Johnson revolver testified that it was sold about twenty months prior to the homicide. An employee who was present when the pistol was sold testified that it was purchased by a man who stated his address and gave his name as "C. M. Johnson." Another witness testified that he had gone to the address given by "C. M. Johnson" and had found it to be fictitious. To show that the slain man had not purchased the revolver under the false name of "C. M. Johnson," the prosecutor, over defendants' objection, called a handwriting expert, who testified that he had compared the signature of James H. Brigham with the signature "C. M. Johnson," signed to the record of the sale of the revolver, and that in his opinion the two signatures were not made by the same person. Appellant contends that this evidence of the handwriting expert was immaterial and tended to confuse the issues. There is no merit in the objection. When the Iver Johnson pistol was found three shots appeared to have been recently fired from it. It was essential to the people's case, therefore, to show, if possible, that Brigham was not the owner of this revolver. To do that it was proper to show that Brigham had not signed the name "C. M. Johnson" given by the purchaser when the revolver was sold.

[8] Appellant took the witness-stand in the court below and gave testimony in his own behalf. On rebuttal the prosecutor called witnesses who were permitted to testify, over defendants' objection, that they knew appellant's general reputation for truth, honesty, and integrity in the community in which he lived, and that it was bad. Appellant, contending that this ruling was erroneous, has cited us to 16 Corpus Juris (p. 580, sec. 1122), but he evidently has confounded the rule respecting the impeachment of an accused, *as an accused,* with the rule respecting the impeachment of an accused *as a witness*. From a very early date it has been held, time and again, that when the defendant in a criminal case testifies for himself and gives testimony to exonerate him from the crime for which he is on trial, he, for the time being, removes from himself the character of a defendant and takes on that of a witness. He becomes "subject to the same rules for testing his credibility before the jury, by impeachment or otherwise, as any other witness," and may be impeached by testimony that his general reputation in the community for truth, honesty and integrity is bad. (*People* v. *Hickman,* 113 Cal. 80 [45 Pac. 175]; *People* v. *Arnold,* 116 Cal. 687 [48 Pac. 803].)

Finally, it is claimed that the court erred in giving and likewise in refusing certain instructions. It is strenuously insisted that the court erred in refusing a proffered instruction on the presumption of innocence and the burden of proof. The instruction correctly states the law and might well have been given; but this is far from saying that the refusal to give it constitutes reversible error. The court fully and fairly instructed the jury in general terms on these subjects, and to more than that appellant is not entitled. Among other charges, the court gave the following: "A defendant in a criminal action is presumed to be innocent until the contrary is proved. This presumption of innocence attaches at every stage of the case and to every fact essential to conviction and goes with you in all your deliberations as jurors, in arriving at your verdict. And in case of a reasonable doubt whether his guilt is satisfactorily shown, he is entitled to an acquittal. . . . The defendants have pleaded that they are not guilty, and you are instructed that such plea puts in issue every material allegation of the information, and casts on the state the burden of

proving every essential fact constituting the crime charged, to your satisfaction, and to the satisfaction of each juror, beyond a reasonable doubt.'' [9] A defendant is not entitled to an instruction in any set form of words. Any form of instruction which fully and fairly presents the point at issue meets the requirements of the statute. [10] Proffered instructions intended simply to emphasize propositions which are covered by the court in its charge to the jury are properly refused.

[11] Defendants proposed, and the court refused, an instruction charging the jury that if they should find from the evidence on the part of the people that the crime amounts only to manslaughter, or was ''justifiable or excusable,'' then ''no burden is placed on the defendant to prove to you, by testimony on his part, any of the circumstances that excuse him.'' Though refusing to give an instruction in this particular form, the court did, nevertheless, charge the jury upon this subject in an instruction which fully and fairly presented the law. This the court did by charging the jury, in the language of section 1105 of the Penal Code, that ''upon a trial for murder, the commission of the homicide by the defendant being proved, the burden of proving circumstances of mitigation, or that justify or excuse it (as defined by instructions heretofore given) devolves upon him, *unless the proof on the part of the prosecution tends to show that the crime committed only amounts to manslaughter, or that the defendant was justifiable or excusable.''* (Italics ours.) It is clear that the meaning of section 1105 is this: If the proof on the part of the prosecution tends to show that the homicide amounts only to manslaughter, or that it was justifiable or excusable, then no burden is placed on the defendant to prove any circumstances of mitigation, or that justify or excuse it. That, therefore, is what the court, in effect, told the jury when it gave an instruction substantially in the language of this code section. The instruction presented by the defendants but stated the same rule of law in a somewhat different form. It could not have thrown any more light upon the question than that which was furnished by the instruction given.

The court charged the jury that the plea of self-defense is not available to a defendant who has sought a quarrel

with the design to force a deadly issue, and thus, through contrivance or fault, has created a real or apparent necessity for the killing. Counsel concede the unimpeachableness of the instruction as an abstract statement of the law, but claim that it is not pertinent to any theory based upon the evidence. In this they are in error. Facts testified to by Mrs. Brigham, if true—and the jury evidently accepted · her version—justified the jury in inferring a situation which warranted the court in giving this instruction.

There is no merit in the claim that the court erred in refusing to advise the jury to find the defendants not guilty of murder in either the first or second degree. Counsel's argument in support of this claim, like much of the argument advanced in support of other points made in appellant's behalf, is based upon the untenable assumption that truth, and only truth, came from the lips of the witnesses for the defense, and that the testimony given by Mrs. Brigham and other witnesses for the prosecution is "false as dicers' oaths." That the truth or falsity of the testimony of any witness rests exclusively with the jury, and with the trial court on motion for a new trial, is a proposition too firmly founded in our jurisprudence to necessitate the citation of authority. The jurors, as was their right, regarded Mrs. Brigham's testimony as credible. They evidently accepted her account of the circumstances attending the killing of her husband. The facts as testified to by her show, without doubt, that the killing was unlawful and with malice aforethought.

Witnesses for the prosecution testified that Brigham never had a "gun" *prior* to the killing. At the conclusion of the evidence defendant's counsel moved to strike out all testimony that the deceased was unarmed at times other than at the time of the homicide. The motion was granted. Notwithstanding the motion was granted in the presence of the jury, appellant now insists that there should have been a specific instruction to disregard the evidence so stricken from the record. The court did charge the jury in general terms that it "should not consider nor be influenced . . . by evidence admitted but afterward upon further consideration by the court stricken out." By this general instruction the jury was charged in unmistakable language, that it was not to consider *any* evidence which, after being ad-

mitted, was stricken out. There was nothing ambiguous about the instruction. If counsel for defendants desired a more specific charge upon the point they should have asked it; failing to do so, the responsibility rests with them.

There are no other points worthy of mention. A careful consideration of the record satisfies us that the trial of appellant was in all respects fair and free from any substantial error, and that the verdict was fully justified by the evidence.

The judgment and order denying a new trial are affirmed.

Works, J., and Craig, J., concurred.

A petition for a rehearing of this cause was denied by the district court of appeal on October 4, 1922, and a petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on October 30, 1922.

All the Justices concurred.