[Crim. No. 1229.  Third Appellate District.—November 3, 1932.]

THE PEOPLE, Respondent, v. FRED BENDER, Appellant.

Bryce Swartfager for Appellant.

U. S. Webb, Attorney-General, and J. Charles Jones, Deputy Attorney-General, for Respondent.

PULLEN, P. J.—The defendant was convicted of grand theft in having obtained by the use of false pretenses $2,000 from the complaining witnesses. The alleged offense arose out of a mining venture involving a lease of certain prop-

erties to be developed for the mining and reduction of cinnabar.

The essence of the offense sought to be charged lies in the obtaining of the money by means of false representations uttered with intent to defraud, and proof that those false representations were relied upon and caused the owner to part with his money.

In order to determine what, if any, were the false representations here relied upon for a conviction, it is necessary to set forth portions of the testimony adduced at the trial. We have no instrument in writing containing the agreement of the parties for the understanding of the various parties was never reduced to a formal written contract. .

One of the complaining witnesses testified as to a meeting with the defendant on April 29, 1931, that being the first that appears in the record, as follows:

"A. Mr. Bender told me he was desirous of securing $2,000, and said he would give me good rights in the property. He said, 'I will guarantee you will get your money back in six months and a per cent, or an interest in the property.'" Later, the same evening, the following transpired:

"A. I asked Mr. Bender, what kind of a lease do you have on this property? He said, 'I have a bonded lease on this property for five years.'" Further, in regard to the lease on the property, Mr. Cutter testified as follows:

"On June 3rd, I asked to see him again. 'What kind of a lease do you have here, Mr. Bender?' He said, 'I have a bonded lease.' I said, 'How much is the bond on that lease?' He said, '$5,000.00.' I said, 'What are the conditions of that lease, Mr. Bender?' He said, 'Simply that I pay $1,000 the first year, $5,000 the second, $5,000 the third, $5,000 the fourth and $5,000 the fifth.'" On another occasion defendant was asked:

"What do you have to offer for the $2,000 that we have? He said, 'Well, boys, how does this proposition strike you? I will give you twenty per cent, and I will keep thirty per cent, and we will reserve the other fifty per cent for the operation of the mine, further financing, and further development of the property.'"

A further conversation was had as to a retort for the smelting of the ores as testified to by one of the complaining

witnesses: "We asked Mr. Bender in regard to that continuous retort . . . There was a drawing of that continuous retort spoken of, there, the drawing of which was on the wall above the mantel of the fireplace, and it was one of a continuous retort manufactured by the Pacific Foundry. That retort, Mr. Bender told us, that that was the one that he had placed the money on account and intended to get."

Upon another occasion, defendant wrote to one of the complaining witnesses, in part, as follows: "Naturally you understand that $2,000.00 would not finance for you the new retort, as I have already payed some on account & the whole amount for the retort is $2,000.00 the only payment due yet is $750.00."

Mr. Blankenship testified that in his first conversation about the mine he had with defendant was about June 2, 1931, when defendant said: "He had paid $1,250.00 on a continuous retort and he wanted some more money to finish paying for it, he wanted us boys to help him out, and to work there with him, get the retort up." The next day the three met and "Mr. Cutter first asked him what kind of a hold he had on the property. He said, 'Well, I have a bonded lease for five years.' Mr. Cutter asked him what kind of a proposition he had to offer. He says, 'Well, I already have $1,250.00 paid on a retort, and done a lot of work here.' He says, 'I will give you boys twenty per cent interest in this bonded lease, and I will keep thirty per cent of it, and we will reserve fifty per cent of it for $2,000.00.' "

Again Mr. Blankenship testified as to a conversation had about June 26, 1931, with defendant as follows:

"A. I asked Mr. Bender, I would like to meet Mr. Vought, he talked very much of him this way and the other, so we went back into San Francisco that day, he says, 'Well, Mr. Vought is a very busy man, you can't see him today, besides I have to go down to the Pacific Foundry and see if we can't get the retort sent up to the Mine within this week,' he says, 'We want to get that up there quicker than anything else to get it in operation.' " And again the same witness had a further conversation with defendant about September 21st concerning the retort:

"I told him I had been down to the Pacific Foundries in San Francisco, and talked to the officials of the company

and found he never paid a dime on the retort, and he did not use any of our money to finish paying for it, and that he never ordered one and never intended to get one. Q. What did Mr. Bender say. A'. 'Well,' he said, 'I decided not to get that retort, I wanted to get a larger furnace.' I said, 'Well, you told us you had money paid on a retort and you were going to use our money to finish paying for it, and as we were going to get it up there and have it installed in a month or six weeks, we would be making quicksilver, and have our money back. I find out, you did not even pay a dime on it, never ordered one or anything.' He said, 'Well, I wanted to get a larger furnace and so we could operate it on a better scale.' "

About July 7 or 8, 1931, a form of agreement was prepared by defendant and submitted to Mr. Cutter and Mr. Blankenship, the complaining witnesses, but objection was made on the ground it was for a percentage only of the profits and did not convey an interest in the bonded lease. Defendant then told Mr. Cutter and Mr. Blankenship to prepare an agreement satisfactory to them, which was done about September 14th, but was not signed by defendant on account of another deal pending.

In order to show what the agreement contained which was drafted and submitted by the complaining witnesses to the defendant as being satisfactory to them, it is, perhaps, enlightening to set forth its essential provisions, as follows:

"Agreement

"This agreement made and entered into this (Sept. 14) day of August, Nineteen Hundred Thirty One, by and between Fred Bender, party of the first part, and Richard Bryce Blankenship and Glen G. Cutter, parties of the second part:

"Witnesseth: That whereas the party of the first part is the owner of a certain bonded lease known as the Socrates Leasing Company on certain properties situated approximately twenty (20) miles from Healdsburg, in Sonoma and Lake Counties, California, commonly known as the Socrates Consolidated Mining Company properties, from which quicksilver and other minerals are being and have been extracted; and

"Whereas, the parties of the second part have advanced to the party of the first part the sum of two thousand

($2,000.00) Dollars to be used in the development of said properties and the extraction of quicksilver and other minerals therefrom.

"Now, therefore, in consideration of the premises and of said sum of Two Thousand ($2,000.00) Dollars, the receipt of which is hereby acknowledged, the party of the first part does hereby agree to accept parties of the second part as associates in the Socrates Leasing Company, a sharing in the following ratio:

"Thirty (30%) per cent to the party of the first part.

"Twenty (20%) per cent to parties of the second part.

"The remaining fifty (50%) per cent to be used for further financing, cost of development and operating expenses of said properties. All profits accruing from the last said fifty (50%) shall be divided equally among the three associates.

"In Witness Whereof, the parties hereunto have set their hands, the day and year first above written.

"...............................
"Party of the First Part.

"...............................
"...............................
"Parties of the Second Part."

Mr. Cutter, one of the complaining witnesses, was asked on cross-examination as to the foregoing agreement:

"Q. After you finished preparing that memorandum and that document, did you have it in such shape it met your approval? Was that your final understanding as to what you had agreed to with Mr. Bender? A. That generally represented what they considered our interest there, yes."

Mr. Blankenship, the other complaining witness, testified with reference to the agreement, when asked: "Q. Who wrote it out on the other piece of paper, who put that there, you and Mr. Cutter?" He answered, "Yes, both of us did some of the writing." "Q. Did Mr. Bender put any of the data on there? A. No, he said we could have it fixed like we wanted it, he always seemed very agreeable. ... Q. Did you bring it back? A. Brought it back and gave it to Mr. Bender, he read it over and said, 'That is satisfactory', he said, 'this Butler Bros. deal is coming on now, I don't want to sign it right now', he says, 'if that turns out right, I will incorporate you boys in that', he says,

'there will only be one deal then, don't want to get too many irons in one fire', I think that is the expression he used.''

Complainants claim that the defendant misrepresented the nature and character of the lease he had upon the property. He (defendant) said he ''had a bonded lease for five years''. Under the theory that the words ''bonded lease'' were peculiar to the mining industry and had a peculiar meaning among mining men, the court permitted a witness for the People to qualify as an expert in mining, and the following questions were asked and answered:

''Mr. Koford: Q. Mr. Ricketts, are you familiar with the term in mining parlance known as a bonded lease? A. Yes. Q. Do any of these instruments or either of them comply with the requirements of a bonded lease, as understood in mining parlance? A. Yes, there is practically a bond for a deed here. I will say . . . that a bond for a deed, as I understand it, . . . is an executory contract to make title upon the performance of conditions stated, and this paper particularly states that upon the payment of the said purchase price . . . the said lessor shall give to the lessee and his assigns a good and sufficient deed to all of said property, and this agreement shall thereafter terminate.''

It is conceded that the agreement under which defendant was operating the property gave him the right to enter upon the described lands for the period of one year under certain terms and conditions as to the use and care of the property, the amount of royalty to be paid, provisions against assignment, etc., and a further agreement, that upon the faithful performance of this agreement, the defendant would, at the expiration thereof, be granted a working lease on the property for the further term of four years, a copy of which lease had been submitted and placed in escrow, in which lease the rental was on a guaranteed royalty basis of $5,000 per year for four years, with a further option to purchase the property, if the lessee desired, at the stipulated amount of $200,000, all royalties paid to be applied as a credit on the option price.

The foregoing briefly are the facts upon which the defendant was convicted of fraudulent representations.

The testimony offered to show the fraudulant representations is not as clear and convincing as one would like to see where the liberty of a man is at stake, but we do find the

positive statements of the defendant in his first conversations with the complaining witnesses that they would receive a per cent or interest in the property. The complaining witnesses made repeated demands upon the defendant to submit for examination the lease under which he claimed, but it was never produced. One of the complaining witnesses suggested that he should go to see Mr. Vought, an officer of the company leasing to defendant, but the defendant did what he could to discourage such a visit, and when finally they did examine the lease, they discovered it contained a clause against assignment and various conditions not theretofore revealed to them. The only answer of the defendant was to suggest some other method of negotiating the lease and obtaining their money for them.

Defendant's several statements with regard to the purchase of a retort had the effect of misleading the complainants. It is true the draft of the agreement prepared by the complaining witnesses did not provide for a retort or for an interest in the leasehold, but it is apparent from the actions of these young men that they were inexperienced in business dealings and the drafting of legal documents, and it is plain from the use of the words "agrees to accept parties of the second part as associates" meant on an equal footing to the extent of the interest conveyed.

Various alleged errors are pointed out by the appellant in the admission of evidence and in the instructions of the court to the jury, but, in view of the correct instructions given and of the evidence properly admitted, we are satisfied it was sufficient to establish the guilt of the defendant, and that it did convince the jury of that fact.

Courts of review are not authorized to reverse a judgment of conviction because of conflict in the testimony, or because of discrepancy of any of the witnesses, or because the testimony is susceptible of two reasonable inferences, one looking to the guilt of the defendant and the other to his innocence. In such cases, the finding of the jury is conclusive.

The judgment and the order are affirmed.

Thompson (R. L.), J., and Plummer, J., concurred.