[Crim. No. 4189. In Bank.—March 2, 1939.]

THE PEOPLE, Respondent, v. WILLIAM GREEN, Appellant.

Ralph Moradian and John J. Gallagher for Appellant.

U. S. Webb, Attorney-General, Burdette J. Daniels, Deputy Attorney-General, and Dan F. Conway, District Attorney, for Respondent.

WASTE, C. J.—After trial before a jury upon a charge contained in an information filed by the district attorney of Fresno County, the defendant was convicted of murder of the first degree and sentenced to pay the extreme penalty. He prosecutes this appeal from the judgment and order denying a new trial.

On April 4, 1938, the body of an elderly man, identified as George W. Leek, was found buried in the vicinity of what is commonly known as "Hobo Jungle" or "Shanty Town", in the city of Fresno. The exact date of death may not be stated, but the evidence tends to indicate that it occurred on or about March 21, 1938. That death resulted from violence appears from the report of the autopsy surgeon giving as the cause therefor "multiple skull fractures and severe bruising and hemorrhage to the brain tissue proper". The doctor was of the opinion that this condition was brought about by a blunt and heavy instrument. A short length of pipe was found buried with the victim's body. Some hair and blood stains found one hundred or more feet from the grave were identified as being similar to and as of the same type as that of the deceased. The blood was still moist

when discovered on April 4th, apparently due to intervening rains.

Defendant's connection with the homicide was established solely by circumstantial evidence which, however, was of sufficient probative value to warrant the jury finding him guilty as charged. Leek, the deceased, lived in a shack in "Shanty Town" though the record discloses him to have been a man of some means. There is evidence that in the years 1932 and 1933 he withdrew approximately $3,000 in gold from a bank and in July, 1937, he had withdrawn $5,000. The defendant lived near the deceased in "Shanty Town" and became acquainted with him during the latter part of 1937. Defendant was seen with the deceased on or about March 21, 1938, in the vicinity in which they lived and about one mile from where deceased's body was later found buried in a shallow grave in a brickyard. It was the theory of the prosecution, which finds support in the evidence, that on and shortly after March 21, 1938, when deceased was supposed to have met his death, the defendant appeared in and around Fresno with considerable more money than he was accustomed to possess and which he employed to pay certain debts and to purchase designated articles of personal property. The record also discloses that in the latter part of March, 1938, the defendant appeared at the sheriff's office and informed a deputy that deceased (who was not then known by the authorities to be dead) had promised him a sum of money if he would fire the tents of some Mexicans in "Shanty Town" with whom deceased was having difficulties and if he would also place a bomb in the sheriff's office. Upon this occasion the defendant also stated that he was expecting a letter of instructions from the victim at San Francisco. On or about March 29, 1938, the defendant brought such a letter to the sheriff's office, purportedly written by deceased and expressing the hope that defendant would carry out his instructions and that as soon as the writer read in the newspapers about the destruction of the sheriff's office he would forward $400 to the defendant. Defendant's story and the production of said letter started an investigation which several days later resulted in the recovery of certain personal property belonging to the deceased in the general vicinity of "Shanty

Town''. Shortly thereafter his body was recovered in its shallow grave a mile or more distant.

The prosecution produced a handwriting expert who, after being shown certain exemplars of the defendant's handwriting, gave it as his ''definite conclusion'' that the letter purportedly written in San Francisco by the deceased to the defendant, under the name of Ray Davis, under which name defendant had mail addressed to him about this time, was in the same handwriting as the exemplars and was written by the same person. This, and other evidence, is capable of a construction that the defendant in order to conceal his spending of deceased's money, and to otherwise establish an alibi for himself, resorted to this subterfuge to create the impression that the deceased was still alive and thus possibly forestall an investigation as to deceased's whereabouts when he should be found to be missing from his usual haunts.

There is evidence in the record that until the latter part of March, 1938, the defendant had practically lived a life of poverty in a tent in ''Shanty Town''. The testimony discloses that subsequent to the time when deceased met his violent death, the defendant mailed to the Oakland store of Montgomery Ward Company a letter (which the expert declared to be in the defendant's handwriting) containing a $100 bill and requesting the shipment of certain phonograph records and the forwarding of the change from the bill to the Fresno Post Office, General Delivery, under the name of Ray Davis. Defendant also sent an identical sum for somewhat similar purposes to each of two mercantile houses in the middle west. Considerable sums of money were also expended by him at about the same time in Fresno and San Francisco. It appears from the record that while in San Francisco (when he may well have addressed the letter to himself under the name of Ray Davis and purportedly written by the deceased) the defendant purchased a watch by trading a watch that he then had. The latter watch was identified as having belonged to the deceased.

Another incriminating circumstance is the fact that when questioned by a postal inspector as to where and how he had acquired the $100 bill forwarded to the Montgomery Ward Company, defendant replied that he had received it from a

sister in Chicago. On cross-examination he admitted this was not the source of its acquisition. At first, he advanced the explanation that he had received the money from the deceased to fire the tents of the Mexicans and to blow up the sheriff's office, but on cross-examination he stated that he received it from the deceased in repayment of sums loaned to the latter. This explanation was offered for the first time when he was in the witness chair, at which time he admitted he had not so previously informed the officers.

As is usual, there are conflicts in the evidence. These were for the jury to determine and it resolved them against the defendant, including his defense that he had no knowledge of and did not participate in the crime. The evidence in the record, only some of which is here recited, together with the inferences deducible therefrom, is amply sufficient to warrant the implied findings of the jury that the death of the deceased resulted from a violent homicide committed for purposes of robbery on or about March 21, 1938, and that the defendant was the perpetrator thereof. The degree of such a murder is fixed by section 189 of the Penal Code as of the first. That the commission of a crime may be adequately established entirely by circumstantial evidence is not open to question. (*People* v. *Peete*, 54 Cal. App. 333, 342, 343 [202 Pac. 51].) It is the function of the jury in the first instance and of the trial court · after the verdict to determine what facts are established by the evidence and before the verdict of the jury which has been approved by the trial court may be set aside on appeal for insufficiency of the evidence, it must be made to appear that there is no substantial evidence to support the conclusion of the jury and the trial court. (*People* v. *Tom Woo*, 181 Cal. 315, 326 [184 Pac. 389] ; *People* v. *Hennessey*, 201 Cal. 568, 571 [258 Pac. 49].) A conviction may not be set aside because the evidence is susceptible of two reasonable inferences, one looking to the guilt of the defendant and the other to his innocence. (*People* v. *Frahm*, 107 Cal. App. 253, 266 [290 Pac. 678] ; *People* v. *Bender*, 127 Cal. App. 331, 337 [15 Pac. (2d) 763].)

Defendant next urges that the court below erred in admitting into evidence certain exhibits. Complaint is first made of the admission of a picture showing deceased's body lying in the grave with a piece of pipe beside the body and

in the grave. The evidence discloses that the pipe was uncovered with the body and the fact that it may have been moved in order to have it appear in the picture could not have been prejudicial. ▮ Nor do we think error resulted from the admission of certain other pictures showing the body of deceased. While urging that these pictures were offered for the sole purpose of prejudicing him before the jury, the defendant in his brief concedes "that photographs ordinarily are admissible as a means of assisting the jury in determining whether a criminal agency was used . . ." Any discrepancy between the condition of the body at the time of death and when the pictures were taken, caused by medical examination and handling, was adequately explained in the testimony. We find nothing of a prejudicial nature in the court's ruling. ▮ The same is true of the ruling admitting the pipe into evidence. It was the theory of the prosecution that the pipe, which was found buried with deceased, was the lethal weapon wielded by the murderer in the commission of the homicide. Frequently upon a murder trial the medium employed to bring about the violent or untimely death of the victim is placed in evidence as a part of the *res gestae*. In *People* v. *Bannon*, 59 Cal. App. 50, 56 [209 Pac. 1029], it is stated that "As a general rule physical objects which constitute a part of the transaction, or which serve to unfold or explain it, may be exhibited in evidence, if properly identified, whenever the transaction is under judicial investigation." The pipe placed in evidence in the present case was identified as the pipe found in the grave with the body. This distinguishes the present case from *People* v. *Hill*, 123 Cal. 571 [56 Pac. 443], relied on by the defendant, for in the cited case there was no evidence identifying the stick there admitted with the crime under investigation. ▮ Defendant also urges that the court below erred when it permitted an employee of a bank to testify that in 1932 and 1933 the deceased made certain withdrawals in gold coins. The evidence is objected to as being too remote. Such objection goes to the weight rather than the admissibility of the evidence. Moreover, the evidence tended to substantiate the theory of the prosecution that a $10 gold piece used by defendant to purchase certain articles was taken by him from the deceased.

 Complaint is next made that the trial court erred in giving and refusing instructions. The charge to the jury has been examined. It was full and fair and accurately defined murder of the first degree. If, as contended by the prosecution and as the evidence indubitably tends to show, and as the jury impliedly found, the deceased was bludgeoned to death for the purpose of relieving him of his money and other valuables, all of the elements of murder in the perpetration of robbery are present as that crime is defined in section 189 of the Penal Code. Such offense is there declared to be murder of the first degree and no error or prejudice resulted from the refusal of the trial court to define and instruct upon the elements of robbery and murder of the second degree. (*People* v. *Rogers*, 163 Cal. 476, 482 [126 Pac. 143].)

 As stated above, a mere reading of the evidence in this case, including inconsistencies in some of the defendant's statements, definitely establishes that the only reasonable hypothesis was that pointing to the defendant's guilt and the jury was justified in acting upon that theory. Among other things, the court instructed the jury that the circumstantial nature of the evidence did not militate against it "provided you believe from the evidence that such facts and circumstances pointing to the guilt of the defendant have been proved beyond a reasonable doubt, and are of such a character as to exclude every reasonable hypothesis except that the defendant is guilty". This being so, no prejudice resulted from a refusal to give an additional instruction requested by defendant to the effect that where the evidence leads to "two opposite rational theories, one consistent with the guilt of the defendant and the other consistent with his innocence, it is the duty of the jury to reject the theory which is consistent with his guilt, and adopt the theory which is consistent with his innocence". The matter was sufficiently covered elsewhere. We cannot say, as a matter of law, that the jury's verdict does not respond to the requirements of the law with respect to the test that there is no rational hypothesis upon which defendant may be innocent and the facts and circumstances as proved be true.

 Defendant's final contention has to do with asserted prejudicial misconduct on the part of the district attorney

occurring in two instances during his argument to the jury. The argument is not printed in the transcript and we therefore have no way of accurately gauging its propriety or impropriety. Nor do we find therein any assignment of error or request that the jury be admonished to disregard the asserted objectionable matter. (*People* v. *Gist*, 28 Cal. App. (2d) 287 [82 Pac. (2d) 501].) However, the jury was instructed that they were to determine the cause upon the *evidence*. It will be presumed that they acted accordingly, uninfluenced by remarks of counsel.

Examination of the record discloses nothing calling for a reversal.

The judgment and order appealed from are, and each is, affirmed.

Shenk, J., Edmonds, J., and Curtis, J., concurred.

Seawell, J., concurred in the judgment.