[Crim. No. 2575. Third Dist. Feb. 21, 1955.]

THE PEOPLE, Respondent, v. PAUL ALBERT DICKERSON et al., Appellants.

Paul Albert Dickerson, in pro. per., and Stewart D. Millon for Appellant Dickerson.

Stanley Payne Sampson, in pro. per., and Robert K. Winters for Appellant Sampson.

Edmund G. Brown, Attorney General, and Gail A. Strader, Deputy Attorney General, for Respondent.

VAN DYKE, P. J.—By an amended information the two appellants and Sarita Marie Sampson, common-law wife of appellant Sampson, were jointly accused of having burglarized Steffens Sport Shop in Vallejo. Appellants Dickerson and Sampson were also charged respectively with five and six prior convictions, which they admitted. The three were tried together before a jury which acquitted· Mrs. Sampson, but convicted each of the appellants of burglary in the second degree. After denial of their motions for a new trial both appellants were sentenced to imprisonment at San Quentin. Within 60 days thereafter the trial judge, pursuant to section 669 of the Penal Code, ordered that the term of imprisonment imposed upon appellant Sampson be served consecutively to

that for a prior felony conviction and that an amended commitment be issued to so provide.

Upon these appeals from the judgments entered upon the jury's verdicts and from the orders denying new trials, both appellants contend that the following circumstantial evidence is insufficient to sustain the verdicts.

The commission of the burglary was not witnessed, but at approximately 3:12 a. m. on December 12, 1953, the Vallejo Police Department received a citizen's telephonic report that the burglary alarm in Steffens Sport Shop was ringing. Patrol cars were dispatched thereto. The officers discovered that entrance to the store had been gained through a broken window and that two shotguns had been removed from a display rack. These guns had been racked so close to the point where the break had been made in the window that they could be reached and removed from the outside. Broken glass and some blood were observed beneath the window and on the sidewalk near the street curb. One week later, on December 19th, the Sacramento police went to Yreka to take one Hap Myers into custody on another charge. At that time they found one of the stolen shotguns hidden in his room and they later recovered the other gun which he had sold in Sacramento on December 14th. Myers was subsequently identified as a man who was in the company of the appellants in the close vicinity of Steffens Sport Shop at about the time of its burglarization. At approximately 3:15 on the morning of the robbery a highway patrol officer saw a car fail to stop at a stop sign. This stop sign was a few blocks away from Steffens store. The patrol officer followed the car two or three blocks, then brought it to a halt and questioned the four occupants, three men and a woman. The men were Myers, Sampson and Dickerson, the woman was Mrs. Sampson. The officer soon came to the conclusion that Sampson, who had been driving, was so intoxicated as to be in no condition to drive and that Dickerson was for the same reason equally incapacitated. Mrs. Sampson said she did not have an operator's license. It does not appear why Myers did not take over the driving. The patrol officer radioed the sheriff's office to have a physician waiting to give Sampson a sobriety test and at the same time he summoned a taxi to take the other three to a bus depot as they said they wished to go to Sacramento. These calls were placed at 3:21 a. m. The automobile was locked and left standing on the street until afternoon when Sampson was released from jail. The patrol

officer did not search the vehicle, but while talking to the parties noticed some blood on a pair of gloves lying in the front seat. It was the theory of the prosecution these gloves were worn by Dickerson when he broke the window in perpetration of the burglary. After the arrest of Myers in Yreka a similar pair of gloves was found in Sampson's apartment in Sacramento. These gloves were introduced in evidence and an expert witness who had tested them prior to trial said he found remnants of blood thereon. There was an irregular cut about an inch long near the base of the thumb of the right-hand glove, extending through the glove texture. It was shown that the position of this cut approximated the position of a cut near the base of Dickerson's right thumb, which cut Dickerson had treated by a physician in Sacramento about 11 o'clock a. m. of the day following the burglary. Sampson accompanied Dickerson to the attending physician's office and had arranged with the physician for the treatment of Dickerson. The taxi driver who drove Dickerson, Myers and Mrs. Sampson to the bus depot was given a dollar bill by Dickerson. He noticed that the bill had blood on it. He looked on the seat where the passengers had been sitting and saw considerable blood on the seat. He looked toward Dickerson and noticed that Dickerson had spots on his trousers which appeared to be blood and that he was wearing gloves which were similar to the gloves received in evidence. The gloves are tan pigskin. The cut on Dickerson's thumb required five or six sutures. Neither Sampson nor Dickerson took the stand at the trial and Myers, who was called as a witness for the prosecution, refused to testify on constitutional grounds. Mrs. Sampson testified that she and appellants did not know Myers and that the man who was in the car with them on the morning in question was a strange hitchhiker whom they had picked up a few minutes prior to the stopping of their car by the patrol officer. She said she and Dickerson parted company with Myers at the bus depot. Myers sold one of the shotguns taken from Steffens store in Sacramento through a Walter Wade and a Harry Carpenter. The sale was made to a Mr. Layton. Wade met Myers at Fourth and K Streets in Sacramento, took the shotgun from him, told Myers he knew where he could dispose of the gun, gave the gun to Carpenter, and Carpenter, having sold it to Layton, received from Layton a check for the price. From this price he retained a few dollars and gave the rest to Wade, who gave the money to Myers, save a few dollars

for himself. A Sacramento police officer testified that on December 20th, when he was questioning Sampson in regard to another matter, Sampson admitted having known Myers "at the pen." Over objection the officer testified as follows:

"A. I asked him about these guns which were taken from this residence at Brite in Yolo County, and he said one of those guns was sold by Hap to a fellow by the name of Walter, a colored fellow by the name of Walter. I says, 'Where did Hap happen to know this fellow Walter?' He says, 'In a joint.' I says, 'What do you mean, in a joint?' He said, 'Up at the pen.' I says, 'Do you know anybody by the name of Walter?' He says, 'Yes, I did.' He said a name I can't recall, and I went to our Bureau of Identification at that time and got a picture of a colored man that I knew by the name of Walter Wade and thinking it might be the same fellow in this picture, I brought it down and showed it to Mr. Sampson. And he says, 'Yes, that's the man.' "

This testimony was by the court ruled as not binding upon Dickerson or upon Mrs. Sampson.

We think it unnecessary to separately discuss the sufficiency of the evidence as to each defendant. ▌ The evidence was wholly circumstantial, but the commission of a crime may be adequately established by such evidence. (*People* v. *Green*, 13 Cal.2d 37, 42 [87 P.2d 821]—wherein the court said that a conviction on circumstantial evidence "may not be set aside because the evidence is susceptible of two reasonable inferences, one looking to defendant's guilt and the other to his innocence.") ▌ From all the evidence in this case it could reasonably be inferred by the jury that the four people found in the automobile of Sampson so few minutes after the breaking of the window set off the burglary alarm had all gone to or near the store in the car; that one or more of them actively perpetrated the burglary by breaking the window; that Dickerson took the guns from the racks, drawing them through the broken window, cutting his hand in so doing, and returned to the car; that they were stopped within a few minutes by the patrol officer and that the guns were then either secreted in the car, or had been secreted without being taken into the car and were picked up later by Myers. Dickerson is substantially tied into active participation in the burglary, and though Sampson argues that the evidence as to him shows nothing more than opportunity and grave suspicion, we think his driving the car in which Dickerson and Myers rode away from the scene

of the crime and his entire association is too close and too continuous to be brushed off as mere opportunity under suspicious circumstances. We are, of course, not here concerned with reasonable doubt. That doctrine passes out of the case at the conclusion of the trial along with the presumption of innocence. We hold the evidence sufficient to uphold each conviction.

Dickerson contends that the trial court abused its discretion in denying his motion for new trial, which was based upon the ground of newly-discovered evidence. This motion was supported by an affidavit made by Myers to the effect that he, Myers, had committed the burglary and that Dickerson did not participate in the commission of the offense and had no knowledge thereof. This affidavit is as remarkable for what it omits as for what it contains. Though Myers says he committed the burglary and Dickerson had nothing to do with it, he does not give any details of how and when he committed the crime so that the People, in opposition to the motion, could check his facts with those known to exist. It was competent for the trial court to consider these matters as well as to distrust Myers' statement in his affidavit that if a new trial were granted to Dickerson he (Myers) would testify and would waive his constitutional privilege at such trial. Notwithstanding that statement, it might well have turned out that Myers would have changed his mind if a new trial had been granted and he had been called to the stand. It is not necessary to consider whether or not this really constituted new evidence. It is enough to say that the trial court was acting within its discretion when it refused on the affidavit of Myers to grant Dickerson a new trial.

Sampson contends that the court committed error in permitting the Sacramento police officer, Trimble, to give the testimony hereinbefore quoted concerning the conversation between them; that the district attorney was guilty of prejudicial misconduct in seeking and obtaining the introduction of that testimony; and that he was guilty of further misconduct in misquoting that same testimony when arguing to the jury. It is a general rule that evidence of other crimes or misconduct outside the framework of the trial is inadmissible. There are certain well-recognized exceptions to the rule, the main one relevant here being the exception that evidence of facts relevant and material to the issues which incidentally show other crimes or misconduct is admissible notwithstanding. In relating the conversation with Sampson the

officer said he had questioned him about some guns taken from a residence in Yolo County. Sampson told the officer that one of the guns taken in Yolo County was sold by Myers to Walter. This was the same Walter through whom Myers sold a gun taken in the Steffens store burglary. It was material to show past associations between Sampson and Myers as bearing upon the inferences to be drawn from his being found with Myers within a few minutes after the Steffens store was burglarized and as conflicting with the testimony of Mrs. Sampson that Myers was merely a stranger whom the others had picked up. The jury were entitled to know the relationships among these men as an aid to deciding whether or not they should infer that Sampson was guilty of complicity in the burglary with which he was charged and this was particularly so where the circumstantial evidence did not conclusively establish guilty complicity. When Sampson told the officer that one of the guns taken at Bryte had been sold by Myers to this same Walter it was permissible to follow up that line of inquiry reasonably and ask the next question, "Where did Hap [Myers] happen to know this fellow?" Sampson's reply was that Myers knew Walter "up at the pen." The officer then inquired, and we think the inquiry was pertinent to be given in evidence in this trial: "Do you know anybody by the name of Walter?" to which Sampson replied, "Yes, I did." He then showed Sampson a picture of Wade taken from the identification files in police headquarters and Sampson said, "Yes, that's the man." All of this may have had but little weight, but we think that there was no error in permitting the testimony. It did show that Sampson knew Wade, the man through whom Myers had disposed of one of the guns taken in the burglary. If Sampson objected to this testimony standing in its unfinished state and wished to guard against an inference by the jury that he knew Wade too well and had known him too long, the witness stand was available.

We come now to the alleged misconduct of the district attorney, both in respect to the proffering of the foregoing testimony of the officer and to his comments upon it during argument. The prosecuting attorney had asked the officer what led him to get out a search warrant which took him to the home of Layton where the gun Layton had bought was found, and the officer answered that he was questioning Sampson in the detective bureau on that morning about some shotguns that had been removed from a residence in

Bryte, Yolo County. He was about to state what Sampson had told him about those things when counsel for Sampson objected, asked that the jury be excused, and that the matter of the admissibility of that evidence be taken up by the court in the absence of the jury. This request was granted. The prosecuting attorney said: "Your Honor, we expect to show by Captain Trimble that he was having a conversation with Mr. Sampson, and they were talking about guns generally, and Sampson during the course of that conversation told him he understood or had some information that this man Myers had sold a shotgun through some fellow . . . , and as a result, or it was on the strength of that conversation, and it was through that conversation they . . . got a line on those particular guns. It is to show knowledge on the part of the defendant that he knew the guns were in Sacramento." The court asked if that could not be done without reference to other possible offenses and was told that the prosecutor thought it could and the court told the witness "to answer within the limits" as best he could. The jury was then called in and the witness was asked what time the conversation had taken place and who were present and where they were. He was then asked to relate the conversation, and he related it as we have hereinbefore set out. We do not see in this situation any misconduct even if it could be said that any part of the conversation which the witness then related was inadmissible. The court had thrown reasonable precautions about the further testimony of the officer and if the witness went too far it was not the fault of the prosecutor. However, when the prosecuting attorney argued the cause he stated that during the course of the conversation "Sampson told Captain Trimble that this Hap Myers had sold a gun the previous month to a fellow by the name of Walter, who he didn't know except by the name of Walter; Captain Trimble said, 'Well, let's see,' and he went to his police files and pulled out People's Exhibit No. 11 and he says, 'Is this the man you are talking about?' and he said, 'Oh, yes, yes, that is the man all right, that is the fellow Hap Myers sold the gun to.' Captain Trimble said, 'How did you know this fellow, where did you find out about these fellows?' And he said, 'I knew him up at the joint,' and Trimble said, 'What joint?' He said, 'Up at Folsom.' " It is obvious that misstatements of the testimony of the officer witness were here made, and of course no trial or appellate court can condone a misstatement of facts by

an attorney in an argument to a jury. Later in the argument the prosecutor said, ". . . Mr. Dickerson and Mr. Sampson had no explanation as to why he stopped to get the hitchhiker. Who he might be, .whether he knew him up at the joint, as he told Captain Trimble." Again the prosecutor was guilty of misstating the evidence to the jury as Sampson had not told the officer he had known Myers "up at the joint" or "up at Folsom." This second misstatement occurred after the prosecutor had been called to task for the first misstatement. Whether or not this misconduct is sufficient to require reversal of the judgment against Sampson presents the closest question before this court upon Sampson's appeal. In such cases there is a strong temptation for an appellate court to conclude that unless reversals are accorded for such misconduct prosecuting attorneys will keep on crowding the line. In considering the matter we must assume that prosecuting attorneys know the rules; and where, as here, the offense is repetitious it is serious. Courts have often been called upon to consider such misconduct. Apparently criticism thereof too often falls upon deaf ears. ■ However, we have concluded that in this case the judgment ought not to be reversed, being moved thereto largely by considering that the jury had heard the evidence and in view of the objections made must have known that in material part that evidence was being misquoted. We cannot assume that the jury was influenced by the prosecutor's misstatements. Under the circumstances we hold that the judgment against Sampson should not be reversed for the misconduct of the prosecuting attorney.

The judgments and the orders appealed from are affirmed.

Peek, J., and Schottky, J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied March 22, 1955.