Filed 8/19/21

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>AHMED MUMIN,<br><br>    Defendant and Appellant. | D076916<br><br><br><br>(Super. Ct. No. SCD261780) |

APPEAL from a judgment of the Superior Court of San Diego County, Kenneth K. So, Judge.  Affirmed as modified.

Raymond M. DiGuiseppe, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Matthew Rodriquez, Acting Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Arlene A. Sevidal, Collette Cavalier and Minh U. Le, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Ahmed Mumin of first degree murder (Pen. Code, §§ 187, subd. (a), 189),[1] burglary (§ 459), and robbery (§ 211).  It found true

---

[1]    Subsequent statutory references are to the Penal Code.

the special circumstance allegations that the murder was committed during the commission of a robbery and a burglary. (§ 190.2, subd. (a)(17).) The jury also convicted Mumin on two counts of premeditated attempted murder of a peace officer (§§ 187, subd. (a), 189, 664), two counts of assault on a peace officer with a semiautomatic firearm (§ 245, subd. (d)(2)), two counts of assault with a semiautomatic firearm (*id.*, subd. (b)), and one count each of possession of a firearm by a felon (§ 29800, subd. (a)(1)) and possession of ammunition by a prohibited person (§ 30305, subd. (a)(1)). The jury found true various firearm enhancements. (§§ 1192.7, subd. (c)(23), 12022.5, subd. (a), 12022.53, subds. (b), (c), (d).) The trial court sentenced Mumin to life imprisonment without the possibility of parole, plus an additional consecutive indeterminate term of 55 years to life imprisonment and a consecutive determinate term of 41 years four months.

Mumin appeals. He contends (1) the evidence did not support a jury instruction on the kill zone theory of attempted murder liability, (2) the trial court committed prejudicial misconduct by questioning Mumin's counsel about her closing argument in the presence of the jury, and (3) his convictions for assault with a semiautomatic firearm should be vacated because they are lesser included offenses of assault on a peace officer with a semiautomatic firearm. The Attorney General concedes the two assault convictions should be vacated or reversed, and we accept this concession. Mumin's two remaining contentions are without merit. We therefore modify the judgment to vacate the two assault convictions (and the stayed sentences thereon) and affirm the judgment as modified.

## FACTS

On April 15, 2015, a clerk was working the night shift at a convenience store in San Diego. A regular customer, Eric Schade, came into the store

2

around 11:00 p.m. and bought a can of beer. He returned a few hours later and asked to borrow a lighter. The clerk thought Schade may have been intoxicated.

As Schade and the clerk talked, a man walked into the store and started yelling. He said, "Everybody get down," and the clerk immediately recognized that he was being robbed. The clerk removed the tray from a cash register and placed it on the counter. The tray contained small bills, since the clerk put larger bills into the safe.

The clerk crouched behind the counter and saw that the man was holding a large silver semiautomatic handgun. The man was pointing the handgun at Schade and telling him to get down. Schade did not respond, and the clerk thought there may have been a struggle. The man shot Schade, took money from the cash register tray, and left the store. The clerk called police and checked on Schade, who was unconscious on the floor of the store.

When the man entered the store, he was wearing a bandana around his face. During the robbery, the bandana began to come loose, and the clerk could see the man's face. The clerk later identified Mumin as the man who robbed the store and shot Schade.

Police arrived and found Schade lying face down, surrounded by blood. Paramedics took him to a hospital, where he later died. A medical examiner determined that his cause of death was a single gunshot wound to the chest.

A San Diego Police Department criminalist performed expedited, same-day DNA testing on a nine-millimeter cartridge casing found at the scene, as

well as a knit cap found nearby. Based on that testing, the criminalist identified Mumin as a potential source of DNA obtained from the items.[2]

Homicide detectives provided Mumin's information to the police department's special investigations unit. The special investigations unit focuses on tracking, locating, and arresting felony suspects. They work in plain clothes, often undercover. Detectives with the special investigations unit identified two addresses that might be associated with Mumin. One detective, Luke Johnson, made contact with Mumin on social media using an assumed identity. Based on that contact, detectives believed Mumin was at an apartment complex on Winona Avenue in San Diego. Johnson attempted to set up a meeting with Mumin using his assumed identity, but he was unsuccessful.

Nonetheless, the detectives gathered at the apartment complex and began surveillance. The complex consisted of several buildings, pedestrian walkways, and a parking lot.

Mumin was at the complex. He encountered a relative and asked him for a ride. The relative asked where he wanted to go, and Mumin replied, "Anywhere." Mumin also asked whether there were police outside the complex, which made the relative hesitant to help him. They talked for a little while. To avoid giving Mumin a ride, the relative told Mumin he had to leave behind a backpack he was carrying, but Mumin was "very adamant" about keeping it. Eventually the relative told Mumin he would give him a ride, but the relative did not intend to follow through. The relative went out to his car, got a drink, and came back. He did not see Mumin again.

---

[2]    Subsequent testing confirmed, to a high degree of certainty, that Mumin's DNA matched the DNA on the cartridge casing. He was also included as a possible major contributor to the mix of DNA obtained from the knit cap.

Meanwhile, the detectives had information that one of Mumin's family members might live in a specific apartment, so they decided to send one detective into the complex to locate it. Several detectives, along with a number of uniformed police officers, waited outside.

The detective walked into the complex on foot. He was not wearing anything that would identify him as a police officer. He saw one individual, who gave him an unfriendly look. The detective continued walking and saw a second individual, likely Mumin, who was holding a dark colored backpack. Mumin noticed the detective and looked startled or scared. He backed away and then turned and ran. The detective told his sergeant about the encounter, and the sergeant told the detective to leave the complex while they formulated a plan.[3]

Police surveillance of the apartment complex continued. Over the radio, the detectives heard that a person in another apartment had reported a burglary in progress. Several uniformed officers went into the complex to investigate. The officers found a backpack near the apartment. The backpack contained Mumin's identification card, several rounds of nine-millimeter ammunition, and a cell phone. The officers broadcast their discovery over the radio.

Based on that information, the detectives were more confident Mumin was in the complex somewhere. They decided to conduct a search. They gathered in the parking lot and put on tactical vests identifying themselves as police officers. The vests have a police badge on the front and the word "police" in large white letters on the back. Some vests have the word "police"

---

[3] Mumin's relative testified that he saw a person who appeared to be an undercover detective when he was walking back from his car. The relative surmised that Mumin would stay hidden while the detective was present, so he used the opportunity to walk back to his family's apartment and go inside.

5

in white letters on the front as well. The five detectives were joined by more than a dozen uniformed officers.

The detectives and uniformed officers went apartment-by-apartment loudly identifying themselves as police and directing the residents to come outside. It was nighttime and dark. A police helicopter flew overhead to assist in the search for Mumin. It spent approximately an hour over the complex.

Eventually two detectives, Johnson and James Mackay, walked over to a building with four doors closely spaced together on the first floor and apartments above. Police officers had just cleared the apartments on the upper floor.

All four doors on the first floor led to a large community room, although the detectives did not know that at the time. The doors were closed. Mackay approached the right-most door (Door 1). It had hinges on the right and its handle was on the left. Mackay stood slightly to the right, in front of the hinges, and reached for the handle. Johnson followed Mackay and positioned himself approximately 25 feet behind and to the left, in front of a neighboring door (Door 2). They appear to have been double doors; the handle of Door 2 was approximately 12 to 18 inches away from the handle of Door 1.

Mackay turned the handle and began to open the door. Mumin was hiding inside the community room and responded with gunfire. He fired three shots. Mackay and Johnson both moved to the right, toward the corner of the building, and took cover. Johnson shot five times through Door 1. Mackay tripped and fell over a short wall, recovered, and shot three times at Door 1. Mackay injured his left hand and suffered some scrapes when he fell.

Numerous police officers converged on the community room. After the gunfire stopped, police commanded Mumin to exit the room. Mumin

6

complied. He had been shot, and he was transported to a hospital for medical treatment. Police recovered a nine-millimeter semiautomatic handgun from the community room, as well as a handgun magazine with blood on it.

Forensic analysis revealed that Mumin shot once through the opening in Door 1 and twice through the closed, neighboring Door 2. The latter two bullets apparently penetrated through Door 2. All three struck near a trash area some distance away. The three bullets, as well as the bullet that killed Schade earlier, were fired by the handgun recovered from the community room. Mumin used hollow-point ammunition, which has a cavity in the nose portion of the projectile. When a hollow-point projectile hits its target, the cavity fills and causes the rest of the material to expand into a mushroom shape. DNA testing of the handgun and associated magazine revealed strong support for the inclusion of Mumin in the mixture of DNA found on those items.

At trial, Mumin called a police department criminalist to testify. She said she recovered $281 in cash from Mumin at the hospital, consisting of two $100 bills and several smaller bills. In closing argument, Mumin's counsel denied that he was the man who robbed the convenience store or shot Schade. But she conceded that Mumin was in the community room and shot at the officers. She argued that he only intended to warn them, not to kill them.

DISCUSSION

I

*Kill Zone Instruction*

A

Mumin first contends the trial court erred by instructing the jury on the kill zone theory of attempted murder liability because there was insufficient evidence to support it under *People v. Canizales* (2019) 7 Cal.5th

7

591 (*Canizales*). *Canizales* clarified the scope of the kill zone theory of liability and provided guidance to courts considering such an instruction. It held, among other things, "Trial courts should tread carefully when the prosecution proposes to rely on such a theory, and should provide an instruction to the jury only in those cases where the court concludes there is sufficient evidence to support a jury determination that the *only* reasonable inference from the circumstances of the offense is that a defendant intended to kill everyone in the zone of fatal harm. The use or attempted use of force that merely *endangered* everyone in the area is insufficient to support a kill zone instruction." (*Id.* at p. 608.)

The emphasis in *Canizales* on the "*only* reasonable inference" has led to a dispute in this appeal regarding the proper standard of review of a trial court's decision to instruct on this theory of liability. (*Canizales*, *supra*, 7 Cal.5th at p. 608.) Mumin argues, with some support in recent caselaw, that we must ourselves be convinced that the only reasonable inference from the evidence is that the defendant had the requisite intent. (See, e.g., *In re Rayford* (2020) 50 Cal.App.5th 754, 779 (*Rayford*).) The Attorney General responds, based on established principles of substantial evidence review, that it is sufficient if we conclude the evidence supports a reasonable inference that the defendant had the requisite intent, even if our review of the evidence indicates the opposite inference would also be reasonable. (See, e.g., *People v. Ghobrial* (2018) 5 Cal.5th 250, 277-278 (*Ghobrial*); *People v. Cole* (2004) 33 Cal.4th 1158, 1206 (*Cole*).)

We agree with the Attorney General. *Canizales* does not depart from, and instead reaffirms, established principles governing a trial court's decision to instruct on a theory of liability and an appellate court's review of such a decision. The trial court must determine whether the evidence would support

8

a *jury determination* that the only reasonable inference was that the defendant held the requisite intent. If a trial court's decision to instruct is challenged on appeal, we must make the same determination on de novo review. But, in so doing, the issue is not whether we believe the only reasonable inference from the evidence is that the defendant had the requisite intent—just as, in other substantial evidence contexts, the issue is not whether we believe the defendant to be guilty beyond a reasonable doubt. The issue is whether the evidence would support such a determination by the jury. Under these circumstances, it is well established that the evidence supports a jury determination that an inference is the *only* reasonable inference if we conclude it is at least *a* reasonable inference. We disagree with *Rayford* to the extent it holds otherwise. We explain our reasoning in greater detail below.

*Canizales* comprehensively examined the origin and development of the kill zone theory of attempted murder liability. It explained, "To prove the crime of attempted murder, the prosecution must establish 'the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing.'" (*Canizales*, *supra*, 7 Cal.5th at p. 602.) "Direct evidence of intent to kill is rare, and ordinarily the intent to kill must be inferred from the statements and actions of the defendant and the circumstances surrounding the crime." (*Ibid*.) The kill zone theory defines a specific category of circumstantial evidence that may support a defendant's intent to kill: "The kill zone theory looks to circumstantial evidence to support a permissive inference regarding a defendant's intent." (*Id*. at p. 606.) But in the absence of precise definition and proper jury instructions, "the potential for misapplication of the kill zone theory remains troubling." (*Id*. at p. 607.)

9

The Supreme Court therefore held "that the kill zone theory for establishing the specific intent to kill required for conviction of attempted murder may properly be applied only when a jury concludes: (1) the circumstances of the defendant's attack on a primary target, including the type and extent of force the defendant used, are such that the only reasonable inference is that the defendant intended to create a zone of fatal harm—that is, an area in which the defendant intended to kill everyone present to ensure the primary target's death—around the primary target and (2) the alleged attempted murder victim who was not the primary target was located within that zone of harm. Taken together, such evidence will support a finding that the defendant harbored the requisite specific intent to kill both the primary target and everyone within the zone of fatal harm." (*Canizales*, *supra*, 7 Cal.5th at p. 607.)

The Supreme Court stressed that evidence supporting the kill zone theory will rarely be found: "We emphasize that going forward trial courts must exercise caution when determining whether to permit the jury to rely upon the kill zone theory. Indeed, we anticipate there will be relatively few cases in which the theory will be applicable and an instruction appropriate. Trial courts should tread carefully when the prosecution proposes to rely on such a theory, and should provide an instruction to the jury only in those cases where the court concludes there is sufficient evidence to support a jury determination that the *only* reasonable inference from the circumstances of the offense is that a defendant intended to kill everyone in the zone of fatal harm. The use or attempted use of force that merely *endangered* everyone in the area is insufficient to support a kill zone instruction." (*Canizales*, *supra*, 7 Cal.5th at p. 608.)

Turning to the record before it, the Supreme Court framed its standard of review as follows: " ' "It is an elementary principle of law that before a jury can be instructed that it may draw a particular inference, evidence must appear in the record which, if believed by the jury, will support the suggested inference." ' " (*Canizales*, *supra*, 7 Cal.5th at p. 609.)

The Supreme Court noted that the evidence supported the inference that one victim was the defendants' primary target. (*Canizales*, *supra*, 7 Cal.5th at p. 609.) But, it explained, "an instruction on the kill zone theory would have been warranted in this case only if there was substantial evidence in the record that, if believed by the jury, would support *a reasonable inference* that defendants intended to kill everyone within the 'kill zone.' To qualify, the record would need to include (1) evidence regarding the circumstances of defendants' attack on [the primary target] that would support a reasonable inference that defendants intentionally created a zone of fatal harm around him, and (2) evidence that [the nontarget victim] was located within that zone of fatal harm. Taken together, such evidence would permit a finding that defendants harbored the requisite intent to kill [the nontarget victim] because he was within the zone of fatal harm that defendants intended to create around [the primary target]." (*Id.* at pp. 609-610, italics added.) The Supreme Court considered and rejected the Attorney General's claim that the evidence was sufficient. It concluded "the evidence concerning the circumstances of the attack . . . was not sufficient to support *a reasonable inference* that defendants intended to create a zone of fatal harm around a primary target." (*Id.* at p. 610, italics added.)

*Canizales* reflects established principles of appellate review following a trial court's decision to instruct on a theory of liability. "A trial court must instruct the jury on every theory that is supported by substantial evidence,

11

that is, evidence that would allow a reasonable jury to make a determination in accordance with the theory presented under the proper standard of proof. [Citation.] We review the trial court's decision de novo. In so doing, we must determine whether there was indeed sufficient evidence to support the giving of [the] instruction. Stated differently, we must determine whether a reasonable trier of fact could have found beyond a reasonable doubt that defendant committed [the offense based on the proffered theory]." (*Cole*, *supra*, 33 Cal.4th at p. 1206; accord, *People v. Montoya* (1994) 7 Cal.4th 1027, 1047 ["The trial court is charged with instructing upon every theory of the case supported by substantial evidence"]; *People v. Ceja* (1993) 4 Cal.4th 1134, 1142-1143 (*Ceja*).) "There is no instructional error when the record contains substantial evidence in support of a guilty verdict on the basis of the challenged theory." (*People v. Jantz* (2006) 137 Cal.App.4th 1283, 1290 (*Jantz*).)

Our review following a trial court's decision to instruct is therefore governed by familiar principles of substantial evidence review. (*People v. Nelson* (2016) 1 Cal.5th 513, 550 [recognizing it is "essentially the same standard"].) "We 'review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citation.] In determining whether a reasonable trier of fact could have found [the defendant] guilty beyond a reasonable doubt, we presume in support of the judgment ' "the existence of every fact the trier could reasonably deduce from the evidence." ' " (*Ibid.*)

"Appellate inquiry into the sufficiency of the evidence 'does not require a court to "ask itself whether *it* believes that the evidence at the trial

12

established guilt beyond a reasonable doubt." [Citation.] Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' [Citation.] In other words, 'it is the jury, not the appellate court which must be convinced of the defendant's guilt.' " (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1055-1056.)

" ' " 'The standard of review is the same in cases in which the prosecution relies mainly on circumstantial evidence. [Citation.] " 'Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court[,] which must be convinced of the defendant's guilt beyond a reasonable doubt. " 'If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment.' " ' " ' " ' " (*Ghobrial, supra*, 5 Cal.5th at pp. 277-278.)

" ' " 'An appellate court must accept logical inferences that the jury might have drawn from the evidence even if the court would have concluded otherwise.' " ' " (*People v. Salazar* (2016) 63 Cal.4th 214, 242.) "The choice of which inference is to be drawn from the facts, where more than one reasonable inference is possible, is the function of the jury." (*People v. Sweeney* (1960) 55 Cal.2d 27, 51; accord, *People v. Cardenas* (2020) 53 Cal.App.5th 102, 120 (*Cardenas*).) "The presence of substantial evidence supporting the [challenged] jury instruction is not undermined by the existence of other interpretations of the evidence." (*Jantz, supra*, 137 Cal.App.4th at p. 1291.)

13

The distinction between the jury, on one hand, and the appellate court, on the other, reflects the fundamental rule that the jury, not the appellate court, must be convinced of the defendant's guilt beyond a reasonable doubt. A jury must acquit a defendant if a reasonable alternative interpretation of the evidence suggests innocence, because it necessarily creates reasonable doubt. A conviction is only warranted if the jury believes the *only* reasonable interpretation of the evidence suggests guilt. But if an appellate court identifies a reasonable alternative interpretation based on its own review of the evidence, it does not necessarily compel reversal, because an appellate court need not be convinced of a defendant's guilt beyond a reasonable doubt. Instead, as noted, the appellate court asks whether the *jury* could have found the defendant guilty beyond a reasonable doubt. It is the jury, of course, that sees and hears the evidence. The appellate court has only the cold record before it. An appellate court's ability to identify a reasonable alternative inference suggesting innocence does not mean that the jury, viewing the evidence live at trial, could not have rejected that inference as unreasonable. As one early case straightforwardly explained, "A conviction may not be set aside because the evidence is susceptible of two reasonable inferences, one looking to the guilt of the defendant and the other to his innocence." (*People v. Green* (1939) 13 Cal.2d 37, 42.)[4]

---

[4] One long-standing example of this standard involves the intent element for burglary, which must also generally be proved using circumstantial evidence: "Although the People must show that a defendant charged with burglary entered the premises with felonious intent, such intent must usually be inferred from all of the facts and circumstances disclosed by the evidence, rarely being directly provable. [Citations.] When the evidence justifies *a reasonable inference* of felonious intent, the verdict may not be disturbed on appeal." (*People v. Matson* (1974) 13 Cal.3d 35, 41, italics added; accord, *People v. Carter* (2005) 36 Cal.4th 1215, 1260-1261.) For an appellate court,

14

Thus, in *Canizales*, the Supreme Court explained that a kill zone instruction was proper where "there is sufficient evidence to support a *jury determination* that the *only* reasonable inference from the circumstances of the offense is that a defendant intended to kill everyone in the zone of fatal harm," i.e., where there is sufficient evidence to support a jury finding of intent beyond a reasonable doubt. (*Canizales*, *supra*, 7 Cal.5th at p. 608, first italics added.) And, because it is the *jury* that must be convinced beyond a reasonable doubt, the Supreme Court did not require that the *appellate court* itself determine whether the inference supporting the instruction was the only reasonable inference. Instead, it explained, "an instruction on the kill zone theory would have been warranted in this case only if there was substantial evidence in the record that, if believed by the jury, would support *a reasonable inference* that defendants intended to kill everyone within the 'kill zone.'" (*Id*. at pp. 609-610, italics added.) In other words, " ' " evidence must appear in the record which, if believed by the jury, will support the suggested inference." ' " (*Id*. at p. 609.) An appellate court need not determine that such an inference is the *only* reasonable inference.

Mumin points to a portion of the introduction in *Canizales*, where the Supreme Court emphasized the following: "We caution . . . that trial courts must be extremely careful in determining when to permit the jury to rely upon the kill zone theory. The kill zone theory permits a jury to infer a defendant's intent to kill an alleged attempted murder victim from circumstantial evidence (the circumstances of the defendant's attack on a primary target). But, under the reasonable doubt standard, a jury may not find a defendant acted with the specific intent to kill everyone in the kill zone

---

the evidence must support a reasonable inference of the requisite intent; it need not be the only reasonable inference.

15

if the circumstances of the attack would also support a reasonable alternative inference more favorable to the defendant.  (See CALCRIM No. 225.)  Permitting reliance on the kill zone theory in such cases risks the jury convicting a defendant based on the kill zone theory where it would not be proper to do so.  As past cases reveal, there is a substantial potential that the kill zone theory may be improperly applied, for instance, where a defendant acts with the intent to kill a primary target but with only conscious disregard of the risk that others may be seriously injured or killed.  Accordingly, in future cases trial courts should reserve the kill zone theory for instances in which there is sufficient evidence from which the jury could find that the *only* reasonable inference is that the defendant intended to kill (not merely to endanger or harm) everyone in the zone of fatal harm." (*Canizales*, *supra*, 7 Cal.5th at p. 597.)

This passage might be read to suggest that a trial court should not instruct the jury on the kill zone theory of liability "if the circumstances of the attack would also support a reasonable alternative inference more favorable to the defendant." (*Canizales*, *supra*, 7 Cal.5th at p. 597.)  But, after this statement, the Supreme Court goes on to repeat the standard formulation:  "Accordingly, in future cases trial courts should reserve the kill zone theory for instances in which there is sufficient evidence from which the jury could find that the *only* reasonable inference is that the defendant intended to kill . . . everyone in the zone of fatal harm." (*Ibid.*)  As noted, this formulation is simply another way of saying that the evidence must support a defendant's guilt beyond a reasonable doubt.  It does not imply any change to the established standard of review where the prosecution relies on circumstantial evidence.  If the evidence supports a reasonable inference of the requisite intent, it necessarily follows that the jury could find it was the

16

only reasonable inference. *Canizales* confirms this principle: "[A]n instruction on the kill zone theory would have been warranted in this case only if there was substantial evidence in the record that, if believed by the jury, would support *a reasonable inference* that defendants intended to kill everyone within the 'kill zone.' " (*Id*. at pp. 609-610, italics added.) Moreover, if *Canizales* had intended to change the established standard of review, the Supreme Court likely would have engaged in a more extensive discussion of the standard and why it should be changed. The Supreme Court's use of the established standard in its own discussion confirms no change was intended.

As noted, Mumin relies heavily on *Rayford* for a different standard. In *Rayford*, two defendants were convicted of attempted murder based on the kill zone theory of liability. (*Rayford*, *supra*, 50 Cal.App.5th at p. 765.) On direct appeal, the court rejected one defendant's contention that the evidence was insufficient to support his convictions. (*Id*. at p. 766.) Later, in two habeas corpus petitions, the defendants challenged the sufficiency of the evidence under *Canizales*. (*Id*. at p. 767.) After holding that *Canizales* was retroactive, the appellate court proceeded to determine "whether 'there is sufficient evidence from which the jury could find that the *only* reasonable inference is that the defendant intended to kill (not merely to endanger or harm) everyone in the zone of fatal harm[.]' " (*Id*. at p. 779, quoting *Canizales*, *supra*, 7 Cal.5th at p. 597.) It noted, "The People argue the circumstances of the shooting here support a reasonable inference the shooters intended to kill everyone in the zone of fatal harm around [the primary target]." (*Rayford*, at p. 779.) After reviewing certain facts supporting the kill zone theory, the court stated, "These facts supported our decision [on direct appeal]." (*Ibid*.) It went on, "However, other

17

circumstances support a reasonable alternative inference more favorable to [the defendants], that the shooters acted not with the specific intent to kill everyone in and in front of the house, but with conscious disregard of the risk [several people] might be seriously injured or killed." (*Ibid*.)

After reviewing the facts and various authorities, *Rayford* concluded, "In light of these facts, coupled with the method of force employed . . . , there is not sufficient evidence from which the jury could find the *only* reasonable inference is that the shooters intended to kill everyone in a zone of fatal harm. [Citation.] Rather, a reasonable alternative inference is that the shooters fired on the house . . . , with conscious disregard of the risk [the primary target] and the others inside and in front of the house would be seriously injured or killed." (*Rayford*, *supra*, 50 Cal.App.5th at pp. 780-781.)

*Rayford* did not discuss the standard of review in detail. It correctly framed the issue as "whether 'there is sufficient evidence from which the jury could find that the *only* reasonable inference is that the defendant intended to kill (not merely to endanger or harm) everyone in the zone of fatal harm[.]' " (*Rayford*, *supra*, 50 Cal.App.5th at p. 779, quoting *Canizales*, *supra*, 7 Cal.5th at p. 597.) But it proceeded to distinguish between one apparently reasonable inference drawn from the evidence, which would support the kill zone theory, and a "reasonable alternative inference," which would not. (*Rayford*, at p. 779) Based on its identification of a "reasonable alternative inference," *Rayford* concluded that the trial court erred in instructing the jury on the kill zone theory. (*Id*. at p. 781.) In this context, the court noted that one piece of evidence was "as consistent with a specific intent to kill as with an intent to punish . . . , with conscious disregard of the risk of fatal harm or serious injury to [the primary target] and [their] family and neighbors." (*Ibid*.)

18

*Rayford*'s analysis appears inconsistent with the principles of substantial evidence review described above. "A reviewing court may not substitute its judgment for that of the jury. It must view the record favorably to the judgment below to determine whether there is evidence to *support* the instruction, not scour the record in search of evidence suggesting a contrary view." (*Ceja, supra,* 4 Cal.4th at p. 1143.) "The presence of substantial evidence supporting the [challenged] jury instruction is not undermined by the existence of other interpretations of the evidence." (*Jantz, supra,* 137 Cal.App.4th at p. 1291.)

While it is not entirely clear, to the extent *Rayford* believed that one reasonable inference from the evidence would support a kill zone instruction under *Canizales,* but a reasonable alternative inference would not, the correct result would have been to uphold the instruction. Where there is "substantial evidence in the record that, if believed by the jury, would support a reasonable inference that defendants intended to kill everyone within the 'kill zone,' " a trial court's decision to instruct on the kill zone theory of liability should be affirmed. (*Canizales, supra,* 7 Cal.5th at pp. 609-610.) The fact that an appellate court can identify a reasonable alternative inference pointing to a different intent does not warrant reversal.

Mumin also relies on *People v. Mitchell* (2019) 7 Cal.5th 561, 579, but the alleged instructional error here is not comparable. *Mitchell* considered whether a jury instruction misstated the law, not whether an instruction was supported by the evidence. Similarly, Mumin cites *People v. McCloud* (2017) 15 Cal.App.5th 948, 956-957, for its discussion of the harmless-beyond-a-reasonable-doubt standard of prejudice where a jury instruction omits an element of an offense. Again, that is not the issue here. We note that Mumin's trial took place a few months after *Canizales* was decided, and the

19

trial court instructed the jury using a modified form instruction to account for its holding. Mumin does not argue, as an independent ground for reversal, that this modified instruction prejudicially misstated the law.

B

Substantively, *Canizales* set out two elements that must be met for the kill zone theory to apply: "[T]he kill zone theory for establishing the specific intent to kill required for conviction of attempted murder may properly be applied only when a jury concludes: (1) the circumstances of the defendant's attack on a primary target, including the type and extent of force the defendant used, are such that the only reasonable inference is that the defendant intended to create a zone of fatal harm—that is, an area in which the defendant intended to kill everyone present to ensure the primary target's death—around the primary target and (2) the alleged attempted murder victim who was not the primary target was located within that zone of harm. Taken together, such evidence will support a finding that the defendant harbored the requisite specific intent to kill both the primary target and everyone within the zone of fatal harm." (*Canizales*, *supra*, 7 Cal.5th at p. 607.)

"In determining the defendant's intent to create a zone of fatal harm and the scope of any such zone, the jury should consider the circumstances of the offense, such as the type of weapon used, the number of shots fired (where a firearm is used), the distance between the defendant and the alleged victims, and the proximity of the alleged victims to the primary target. Evidence that a defendant who intends to kill a primary target acted with only conscious disregard of the risk of serious injury or death for those around a primary target does not satisfy the kill zone theory. As the Court of Appeal recently explained in *People v. Medina* (2019) 33 Cal.App.5th 146,

20

156 . . . , the kill zone theory does not apply where 'the defendant merely subjected persons near the primary target to lethal risk. Rather, in a kill zone case, the defendant has a primary target and reasons [that] he cannot miss that intended target if he kills everyone in the area in which the target is located. In the absence of such evidence, the kill zone instruction should not be given.' " (*Canizales*, *supra*, 7 Cal.5th at p. 607.)

Turning to the facts before it, *Canizales* tailored the general standard of review to the evidence in the record: "[A]n instruction on the kill zone theory would have been warranted in this case only if there was substantial evidence in the record that, if believed by the jury, would support a reasonable inference that defendants intended to kill everyone within the 'kill zone.' To qualify, the record would need to include (1) evidence regarding the circumstances of defendants' attack on [the primary target] that would support a reasonable inference that defendants intentionally created a zone of fatal harm around him, and (2) evidence that [the nontarget victim] was located within that zone of fatal harm. Taken together, such evidence would permit a finding that defendants harbored the requisite intent to kill [the nontarget victim] because he was within the zone of fatal harm that defendants intended to create around [the primary target]." (*Canizales*, *supra*, 7 Cal.5th at pp. 609-610.)

In *Canizales*, the evidence showed that the shooter fired five bullets, from around 100 feet away, on a wide city street. (*Canizales*, *supra*, 7 Cal.5th at p. 611.) The bullets were " 'going everywhere' " and did not hit anyone. (*Ibid*.) The Supreme Court concluded "that the evidence concerning the circumstances of the attack (including the type and extent of force used by [the shooter]) was not sufficient to support a reasonable inference that defendants intended to create a zone of fatal harm around a primary target."

21

(*Id*. at p. 610.) An instruction on the kill zone theory of liability was therefore unwarranted. (*Id*. at p. 611.)

By contrast, the Supreme Court approved of a kill zone instruction in the earlier case of *People v. Bland* (2002) 28 Cal.4th 313. "The record there showed that the defendant and a fellow gang member approached a car in which a rival gang member was sitting in the driver's seat and opened fire with a .38-caliber handgun, shooting numerous rounds both into the vehicle and at the vehicle as it drove away. The driver was killed and his two passengers, who were not gang members, were wounded. [Citation.] [The Supreme Court] concluded that the evidence 'virtually compelled' a finding that even if the defendant primarily intended to kill the rival gang member, he also, concurrently, intended to kill the passengers in the car, or, at the least, intended to create a zone of fatal harm." (*Canizales*, *supra*, 7 Cal.5th at p. 603, citing *Bland*, at pp. 318, 333.)

Following *Canizales*, courts found sufficient evidence to support a kill zone conviction or instruction where the defendants rapidly fired 21 shots "into a small space enclosed on three sides" (*People v. Dominguez* (2021) 66 Cal.App.5th 163, 187); where the defendants fired multiple bullets "at close range against two people who were walking side by side in such close proximity that they fell into each other" (*People v. Windfield* (2021) 59 Cal.App.5th 496, 517); and where a defendant fired 16 rounds from a high-powered assault rifle at an occupied house, "targeting specific locations of the house where the victims were present," and apparently another defendant fired at least six shots at another house using the same high-powered assault rifle (*People v. Cerda* (2020) 45 Cal.App.5th 1, 17 (*Cerda*), review granted May 13, 2020, S260915). Courts have found insufficient evidence where the defendant fired three to seven shots at the driver of a stationary car at close

22

range, missing the passenger, "but there were no bullet holes in the car's body or doors that would have reflected a spray of bullets" (*People v. Booker* (2020) 58 Cal.App.5th 482, 500); where the defendant first fired directly at his target, "did not sweep his arm from side to side or spray the area with bullets," and thereafter fired while retreating, placing distance and obstructions between himself and other potential victims (*Cardenas*, *supra*, 53 Cal.App.5th at pp. 114, 115); and where the defendant fired first at his intended target and, after the target was mortally wounded, turned and fired at other victims (*People v. Mariscal* (2020) 47 Cal.App.5th 129, 139).[5]

Here, as an initial matter, Mumin contends there was insufficient evidence of a "primary target" that he specifically intended to kill. The kill zone theory of liability requires a primary target. (*Canizales*, *supra*, 7 Cal.5th at p. 608; *People v. Thompkins* (2020) 50 Cal.App.5th 365, 394-395.) The prosecution's theory was that Mackay was Mumin's primary target. The

---

[5]    In *Rayford*, the defendants fired at a gathering of people, and the house behind them, from approximately 30 feet away. (*Rayford*, *supra*, 50 Cal.App.5th at p. 762.) In support of a kill zone instruction, *Rayford* noted, "A series of eight bullets struck the house in an area surrounding [the primary target] and the others on the grass, who had limited means of escape as they funneled into the entrance of the house. One bullet struck [another person]. The gunfire that traveled from east to west was powerful enough to pierce multiple walls within the house." (*Id.* at p. 779.) In support of the "reasonable alternative inference," *Rayford* noted, "Each shooter shot at most four bullets at the house . . . . [One defendant] was standing in front of [the primary target], but he shot 'directly towards the house,' not at her. He also fired at the front window where no one was standing, but a cousin was looking out. [The other defendant] only shot into the air. Neither [the primary target] nor [another individual] testified any shooter targeted specific victims. The eight bullets that were recovered were not fired at a specific location, instead striking the house from the window to the right of the front door to the wood to the left of the door. Although the weapons had sufficient force to pierce the walls of the house, there was no evidence the guns were rapid-firing semiautomatic or automatic weapons." (*Ibid.*)

23

jury could reasonably find that Mumin fired at Mackay through the opening in Door 1, at close range, just as Mackay began to open it. This evidence is sufficient to support a reasonable inference that Mumin intended to kill Mackay. "The act of firing toward a victim at a close, but not point blank, range 'in a manner that could have inflicted a mortal wound had the bullet been on target is sufficient to support an inference of intent to kill . . . .' " (*People v. Chinchilla* (1997) 52 Cal.App.4th 683, 690; accord, *People v. Perez* (2010) 50 Cal.4th 222, 230.) Mumin emphasizes other facts, such as his apparent desire to avoid confrontation by hiding in the community room, but they do not make an inference of intent to kill unreasonable. Contrary to Mumin's suggestion, we do not reweigh the evidence on appeal. "We presume in support of the judgment the existence of every fact the jury reasonably could deduce from the evidence. [Citation.] If the circumstances reasonably justify the findings made by the trier of fact, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding." (*People v. Jennings* (2010) 50 Cal.4th 616, 638-639; accord, *Jantz, supra*, 137 Cal.App.4th at p. 1291.)

In his opening brief, Mumin claims he only fired at Door 2, not Door 1, and therefore did not target Mackay. He cites only his counsel's closing argument as support. His counsel's argument is not evidence. (See *In re Zeth S.* (2003) 31 Cal.4th 396, 413, fn. 11; *People v. Superior Court* (*Crook*) (1978) 83 Cal.App.3d 335, 341.) The evidence plainly supports the reasonable inference that Mumin fired three shots, two that went through Door 2 (because it had two bullet holes going from inside the community room outward) and one that went through the opening in Door 1. Indeed, on reply, Mumin appears to backtrack, noting that "two of the three shots went through Door 2" and the third went somewhere else. Mumin has not shown

24

the evidence did not support his specific intent to kill Mackay as the primary target.

Mumin next contends there was insufficient evidence that he intended to create a zone of fatal harm around Mackay, i.e., an area in which Mumin intended to kill everyone present to ensure Mackay's death. We disagree. Based on the evidence, the jury could reasonably have found the following: Mumin armed himself with a semiautomatic firearm and hollow-point bullets. Hollow-point bullets are particularly damaging based on their design. Mumin had recently fatally shot a nonthreatening individual who would not comply with his demands. After trying and failing to escape from his apartment complex, Mumin hid in the community room with his loaded firearm. He heard numerous police officers calling around the apartment complex, as well as a police helicopter overhead. When Mackay began to open Door 1, Mumin believed the police had found his hiding place. In rapid succession, Mumin fired through the opening at Door 1 and swept over to Door 2, firing two more shots that penetrated through the closed door and struck objects some distance away. The jury could reasonably conclude, based on this evidence, that Mumin was unsure exactly where the police officer opening the door was located and intended to create a zone of fatal harm in front of both double doors, killing anyone in that zone in order to ensure that the police officer (Mackay) would be killed as well. It was the last stand of a desperate killer who had endured more than an hour in the community room listening and waiting for police to find him.

In arguing that the evidence was insufficient to instruct on the kill zone theory of liability, Mumin frames the issue as whether "the *only* reasonable inference" to be drawn from the evidence is that he intended to create a kill zone. We have already explained why this standard of review is incorrect.

25

Mumin's contention therefore fails at the outset. (See *People v. Foss* (2007) 155 Cal.App.4th 113, 126.) Nonetheless, we will consider his arguments as if they had been made under the proper standard.

Mumin focuses on the number of shots fired, again claiming they were all fired at Door 2. We have already explained why the evidence would support a different finding. And while the number of shots fired was not high, the type of firearm and ammunition used, as well as the surrounding circumstances, support the reasonable inference that Mumin intended to create a kill zone. His firearm was semiautomatic, and he fired his three shots rapidly in quick succession. His bullets were hollow point, which are designed to cause greater damage. They were powerful enough to penetrate a closed door and travel some distance away. Mumin rapidly sprayed bullets across the two doors, without warning and without delay, minimizing the chance that anyone on the other side could escape. Moreover, Mackay and Johnson immediately returned fire, wounding Mumin and likely persuading him that continuing the firefight was unwise. A jury could reasonably infer that the three shots fired by Mumin were not a product of his unwillingness to use greater force, but were instead limited by the officers' quick and effective response.

Mumin emphasizes the openness of the area facing the community room. Generally, an open area tends to undermine the inference that a defendant intended to create a kill zone because, among other reasons, it would be unlikely for a defendant to believe he could cover such a large area with lethal force using a conventional firearm. Here, however, Mumin's area of focus was the area behind Door 1 and Door 2. The evidence supports the reasonable inference that Mumin intended to, and did, blanket this more limited area with lethal force. It is of lesser relevance that Johnson had a

more open area beside and behind him, away from the doors, since his exact position and surroundings were not known to Mumin. The limited physical space facing Mumin, and his coverage of that space with lethal force, supports the reasonable inference that Mumin intended to kill both Mackay and anyone else on the opposite side of the doors. The openness of the area facing the community room is not irrelevant, but it also does not make unreasonable the inference that Mumin intended to create a kill zone in a subset of that area facing Door 1 and Door 2.[6]

Mumin argues that the kill zone theory is unsupported because there was no evidence Mumin knew anyone besides Mackay was on the other side of the doors. He is incorrect. The kill zone theory of liability does not require that a defendant be specifically aware of other victims within the kill zone. "Whether or not the defendant is aware that the attempted murder victims were within the zone of harm is not a defense, as long as the victims actually were within the zone of harm." (*People v. Adams* (2008) 169 Cal.App.4th 1009, 1023.) Instead, the focus remains on the defendant's intent. A defendant's awareness of potential victims is relevant to that intent, but it is not dispositive. (*Cerda*, *supra*, 45 Cal.App.5th at p. 20, review granted.) Here, based on the evidence of extensive police activity at the complex, it would be reasonable to infer that Mumin was aware that the police officer opening the door was unlikely to be alone. But even if Mumin could not be sure that another officer was with Mackay, the evidence supports the

[6]    Similarly, Mumin notes that no one was injured by the three shots he fired. This fact is relevant but not dispositive. The sufficiency of the evidence supporting a kill zone instruction "does not turn on the effectiveness or ineffectiveness of the defendant's chosen method of attack." (*Canizales*, *supra*, 7 Cal.5th at p. 611.) The circumstances of the shooting support a reasonable inference that Mumin harbored the requisite intent, notwithstanding the lack of injury, for the reasons we have already discussed.

reasonable inference that Mumin intended to kill anyone who ended up being behind Door 1 and Door 2 in order to ensure Mackay was also killed. This inference is sufficient to support the kill zone theory of liability.

The kill zone theory additionally requires evidence that the victim who was not the primary target was located within the zone of fatal harm. (*Canizales*, *supra*, 7 Cal.5th at p. 610.) "[T]he jury is to consider the circumstances of the attack, including the type and extent of force used during the attack, to determine the scope of that zone and whether the alleged victim was within the zone." (*Id*. at p. 612.) Here, based on the firearm and ammunition used, the number of shots, the trajectory of Mumin's bullets, and the distance they travelled, a jury could reasonably find that the zone of fatal harm encompassed the area in front of Door 1 and Door 2, from the doors themselves to somewhere behind where Johnson was standing. When Mackay opened Door 1, and Mumin began shooting, Johnson was standing in front of Door 2 approximately 25 feet away. Mumin specifically fired two shots through Door 2, and those two hollow-point bullets struck a trash area behind Johnson. Johnson was located in the area traversed by the bullets, and he could have been struck by them. Based on this evidence, a jury could reasonably infer that Johnson was located in the zone of fatal harm.

Mumin claims that the kill zone, if any, was only located in front of Door 1. In Mumin's view, because Johnson was standing in front of Door 2, and only moved toward Door 1 after Mumin stopped shooting, he was not located in the kill zone. Mumin's limited view of the scope of the kill zone is unwarranted. As discussed, a jury could reasonably find that the kill zone encompassed the area in front of both Door 1 and Door 2 and Johnson was located in this area.

In sum, based on the evidence, a jury could reasonably find that Mumin intended to create a zone of fatal harm around Mackay, i.e., an area in which Mumin intended to kill everyone present to ensure Mackay's death, and that Johnson was located in that zone. The evidence therefore supports an instruction on the kill zone theory of liability under *Canizales*, and the trial court did not err by providing such an instruction to the jury.

## II

### *Question Regarding Defense Counsel's Closing Argument*

Mumin next contends the trial court committed misconduct by questioning his counsel, in the presence of at least some jurors, about her closing argument. In that argument, Mumin's counsel conceded his guilt on certain offenses stemming from the community room shooting, but she maintained he was not guilty of attempted murder. After the court excused the jury, the court asked, "And for the record, this approach on the argument has been discussed with your client?" Mumin's counsel started to respond, and the court said, "Approach that you just made." Mumin's counsel responded, "I would wait till everyone is out of the room." The court said, "So the answer is yes?" Mumin's counsel answered, "Yes." The transcript does not reflect whether there were any pauses or delays between the statements. After a break, outside the presence of the jury, the court continued to discuss whether Mumin objected to his counsel's approach. (See *McCoy v. Louisiana* (2018) 584 U.S. __ [138 S.Ct. 1500, 1510] ["[C]ounsel may not admit her client's guilt of a charged crime over the client's intransigent objection to that admission."].)

"Although the trial court has both the duty and the discretion to control the conduct of the trial [citation], the court 'commits misconduct if it persistently makes discourteous and disparaging remarks to defense counsel

29

so as to discredit the defense or create the impression it is allying itself with the prosecution.' " (*People v. Snow* (2003) 30 Cal.4th 43, 78 (*Snow*).) " 'When "the trial court persists in making discourteous and disparaging remarks to a defendant's counsel and witnesses and utters frequent comment from which the jury may plainly perceive that the testimony of the witnesses is not believed by the judge . . . it has transcended so far beyond the pale of judicial fairness as to render a new trial necessary." ' [Citation.] But a defendant seeking relief on such a theory must establish prejudice. ' "[O]ur role . . . is not to determine whether the trial judge's conduct left something to be desired, or even whether some comments would have been better left unsaid. Rather, we must determine whether the judge's behavior was so prejudicial that it denied [the defendant] a fair, as opposed to a perfect, trial." ' [Citation.] We make that determination on a case-by-case basis, examining the context of the court's comments and the circumstances under which they occurred. [Citation.] Thus, the propriety and prejudicial effect of a particular comment are judged by both its content and the circumstances surrounding it." (*People v. Abel* (2012) 53 Cal.4th 891, 914 (*Abel*).)

As an initial matter, we conclude Mumin forfeited his claim of error by failing to object to the court's question. "[A] defendant who fails to make a timely objection to the claimed misconduct forfeits the claim unless it appears an objection or admonition could not have cured any resulting prejudice or that objecting would have been futile." (*Abel, supra*, 53 Cal.4th at p. 914.) Mumin contends his counsel's request to discuss her approach outside the presence of the jury was sufficient. We disagree because her request did not inform the court that she believed the court had committed misconduct. Mumin asserts "[i]t would have been futile, if not dangerous, to push any further" in front of the jury. But Mumin's counsel could have objected *outside*

30

the presence of the jury.  "[T]he circumstances in no way suggest an objection and a request to have the jury admonished would have found an unsympathetic jurist."  (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1320 (*Seumanu*).)

Even considering Mumin's contention on the merits, and assuming without deciding that the trial court's question was misconduct, Mumin has not shown prejudice.  It is unlikely a lay jury understood that the trial court's question was unusual in any way.  On its face, the question does not imply any criticism of the argument.  The court merely asked if Mumin's counsel had discussed her approach with Mumin.  (See *Snow*, *supra*, 30 Cal.4th at p. 79 ["In asking defense counsel whether a line of questioning . . . was within the scope of redirect, the court neither disparaged counsel's efforts nor prevented counsel from pursuing cross-examination."].)  The question was also one isolated incident of alleged misconduct.  Mumin has not shown it deprived him of a fair trial or had any effect on the jury's verdict. (See *Seumanu*, *supra*, 61 Cal.4th at p. 1321 ["the trial court's single, brief comment could not possibly have been prejudicial"]; see also *Abel*, *supra*, 53 Cal.4th at p. 914; *Snow*, at pp. 81-82.)

Mumin also has not shown he was deprived of his right to effective assistance of counsel.  He relies on *People v. Diggs* (1986) 177 Cal.App.3d 958, 970, where defense counsel in closing argument "effectively withdrew a crucial defense and admitted his client's guilt without his client's consent." Mumin raises no similar error.  His focus is solely on the court's question, which was not prejudicial misconduct for the reasons already discussed.

# III

## *Lesser Included Offenses*

Mumin contends his convictions for assault with a semiautomatic firearm (§ 245, subd. (b)) should be vacated because they are lesser included offenses of assault on a peace officer with a semiautomatic firearm (*id.*, subd. (d)(2)). The Attorney General concedes he could not be convicted of both sets of offenses. We agree as well.

"In general, a person may be *convicted* of, although not *punished* for, more than one crime arising out of the same act or course of conduct. 'In California, a single act or course of conduct by a defendant can lead to convictions "of *any number* of the offenses charged." [Citations.]' [Citation.] Section 954 generally permits multiple conviction. Section 654 is its counterpart concerning punishment. It prohibits multiple punishment for the same 'act or omission.' When section 954 permits multiple conviction, but section 654 prohibits multiple punishment, the trial court must stay execution of sentence on the convictions for which multiple punishment is prohibited." (*People v. Reed* (2006) 38 Cal.4th 1224, 1226-1227.) "A judicially created exception to the general rule permitting multiple conviction 'prohibits multiple convictions based on necessarily included offenses.' [Citation.] '[I]f a crime cannot be committed without also necessarily committing a lesser offense, the latter is a lesser included offense within the former.' " (*Id.* at p. 1227.)

"To ascertain whether one crime is necessarily included in another, courts may look either to the accusatory pleading or the statutory elements of the crimes. When, as here, the accusatory pleading incorporates the statutory definition of the charged offense without referring to the particular facts, a reviewing court must rely on the statutory elements to determine if

there is a lesser included offense. [Citations.] 'The elements test is satisfied if the statutory elements of the greater offense include all of the statutory elements of the lesser offense, such that all legal elements of the lesser offense are also elements of the greater. [Citation.] In other words, " '[i]f a crime cannot be committed without also necessarily committing a lesser offense, the latter is a lesser included offense within the former.' " ' [Citation.] Nevertheless, if the *same* evidence is required to support *all* elements of both offenses, there is no lesser included offense. [Citation.] Each is its own offense, based on different statutes that apply to the same conduct; neither can be said to be a lesser of the other." (*People v. Robinson* (2016) 63 Cal.4th 200, 207.)

Here, as the parties agree, the greater offense of assault on a peace officer with a semiautomatic firearm (§ 245, subd. (d)(2)) includes all of the statutory elements of the lesser offense of assault with a semiautomatic firearm (*id*., subd. (b))—plus the additional element that the assault must be upon the person of a peace officer, who the defendant knows or reasonably should know is a peace officer engaged in the performance of his or her duties, and who is engaged in the performance of his or her duties (*id*., subd. (d)(2)). Mumin therefore could not be convicted of both sets of assault offenses. His convictions on the lesser included offenses must be vacated. (See *People v. Vela* (2012) 205 Cal.App.4th 942, 945; *People v. Oldham* (2000) 81 Cal.App.4th 1, 16.) Because the court stayed the sentences for those convictions under section 654, our disposition does not affect Mumin's sentence and remand for resentencing is unnecessary. (See *People v. Espinoza* (2002) 95 Cal.App.4th 1287, 1321-1322.)

33

## DISPOSITION

The judgment is modified to vacate Mumin's convictions for assault with a semiautomatic firearm, the attached enhancements, and the stayed sentences thereon.  As so modified, the judgment is affirmed.  The trial court is directed to prepare an amended abstract of judgment and forward it to the Department of Corrections and Rehabilitation.


GUERRERO, J.

WE CONCUR:


McCONNELL, P. J.


HALLER, J.

34